748 So.2d 922 (1999)
Osvaldo ALMEIDA, Appellant, Cross-Appellee,
v.
STATE of Florida, Appellee, Cross-Appellant.
No. 89,432.
Supreme Court of Florida.
July 8, 1999.
Rehearing Denied August 30, 1999.
*924 Richard L. Jorandby, Public Defender, and Gary Caldwell, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, Florida, for Appellant, Cross-Appellee.
Robert A. Butterworth, Attorney General, and David M. Schultz, Assistant Attorney General, West Palm Beach, Florida, for Appellee, Cross-Appellant.
SHAW, J.
We have on appeal the judgment and sentence of the trial court imposing the death penalty on Osvaldo Almeida. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm the conviction but vacate the death sentence and remand for imposition of a life sentence without possibility of parole for twenty-five years.
During the early morning hours of November 15, 1993, Osvaldo Almeida and Louis Salmon met several friends at Higgy's restaurant and ordered a pitcher of beer. When Almeida started to take a *925 drink, the manager, Frank Ingargiola, came to the table and grabbed the glass out of his hand. Almeida was underage (he was twenty years old at the time) and had been kicked out of the restaurant before for drinking. Ingargiola told him this night to leave and not come back. Almeida was acutely embarrassed by the incident, and several hours later he obtained a.44 caliber handgun, returned to Higgy's, and sometime after 4:30 a.m. shot Ingargiola. Almeida later told friends that he had committed the murder, and when he was arrested several days later police found the murder weapon in his car. He confessed to police.
Almeida was charged with first-degree murder, and during the guilt phase of the trial he contended that he was insane at the time of the crime. Family members and mental health experts testified concerning his extraordinarily brutal upbringing in Brazil,[1] and two mental health experts testified that he could not distinguish right from wrong at the time of the crime.[2] In rebuttal, the State presented two experts who testified that Almeida knew right from wrong at the time of the crime.[3] Almeida was convicted as charged.
During the penalty phase, the State presented evidence of Almeida's first-degree murder convictions for killing two prostitutes in the weeks preceding the present crime.[4] In mitigation, the defense presented testimony of family members attesting to Almeida's abusive childhood and testimony of several mental health experts attesting to his unstable mental state.[5] *926 The jury recommended death by a seven to five vote and the judge imposed a sentence of death based on two aggravating circumstances,[6] three statutory mitigating circumstances,[7] and eight nonstatutory mitigating circumstances.[8] Almeida appeals, raising fifteen issues,[9] and the State cross-appeals, raising a single issue.[10]
Almeida's first claim concerns a discussion that took place during the State's closing argument in the guilt phase. The claim focuses on three statements made by the prosecutor:
[MR. DONNELLY (prosecutor):] [Statement No. 1.] All persons are presumed to be sane. However, if the evidence causes you to have a reasonable doubt concerning the defendant's sanity, then the presumption of sanity vanishes and the State, I must prove beyond a reasonable doubt that the defendant was sane.
He is presumed to be sane. What evidence did you hear that led you to believe beyond a reasonable doubt that he is not sane?

MR. MOLDOF [defense counsel]: Objection, that's not the standard.
THE COURT: It's overruled. This is closings. Come on.
MR. DONNELLY: [Statement No. 2.] The testimony of Dr. Abbey Strauss and Dr. Ross Seligson was presented. If he is probably insane from what these doctors say, he is still presumed sane, still presumed sane. We're going to analyze their testimony in a couple minutes.
If evidence is presented beyond a reasonable doubt that leads you to believe that he is not sane, then that presumption vanishes.
MR. MOLDOF: That's the wrong standard. I would like to approach the bench.
THE COURT: If you want to approach the bench, fine, but I am going to instruct the jury as to the applicable and appropriate standard when I instruct them on the law. And it's the instructions that the Court gives that the jury is bound to follow. What the lawyers say is not evidence and it's not the law.
MR. MOLDOF: I would still like to approach for a moment.
*927 (Emphasis added.) Following the bench conference, the prosecutor then made this statement to the jury without objection:
MR. DONNELLY: [Statement No. 3.] The Judge is going to instruct you on the law regarding insanity, this is what we anticipate that he will read to you or instruct you regarding sanity. All persons are presumed to be sane. However, if the evidence causes you to have a reasonable doubt concerning the defendant's sanity, then the presumption of sanity vanishes and the State must prove beyond a reasonable doubt that the defendant was sane.

Almeida now claims that the trial court erred in overruling his objection to the prosecutor's first statement above. We agree.
The prosecutor's initial comment was an incorrect statement of the law. See Fla. Std. Jury Instr. (Crim.) 37. The trial court thus erred in overruling the objection. We find the error harmless, however, on this record: (1) The misstatement was presented to the jury in the context of closing argument by an advocate, not in the context of an instruction by the court; (2) the misstatement was an innocent onethe prosecutor was struggling with a subtle rule of law that is difficult to articulate; (3) although the prosecutor repeated the incorrect statement to the jury (the second statement above), he minutes later read the proper instruction (the third statement above); (4) immediately following the prosecutor's second improper statement, the court announced before the jury that (a) the court would be instructing them on the law, (b) they were to follow only its instructions, and (c) what the lawyers say is neither evidence nor law; (5) before the jury retired, the court also read the standard instruction to the jury; and (6) the jury took a copy of the standard instruction into the jury room during deliberations. We find the error harmless on this record.
To the extent that Almeida now complains that the court erred in the way it addressed this issue after defense counsel asked to approach the bench, we disagree. The record shows that following the second statement above, it was defense counsel who led the discussion at the bench and who suggested the ultimate remedy, i.e., that the prosecutor read the standard instruction to the jury ("Why don't you just read it?"). This is exactly what the prosecutor did. Defense counsel then seemed satisfiedhe asked for no curative instruction or other palliative measure and filed no objection. The trial continued in a routine fashion. The trial court had no notice whatsoever that defense counsel was anything but pleased with the resolution. We find no abuse of discretion. See generally Hooper v. State, 476 So.2d 1253 (Fla.1985).
Almeida next claims error on several points. During the course of the trial, the following transpired: (1) The prosecutor asked Louis Salmon if he was referring in his testimony to an incident involving a knife;[11] (2) Almeida's employer testified that Almeida had told him that he had a vision of killing and felt no remorse;[12] (3) Salmon testified that appellant *928 had told him that Black Talon bullets make a big exit wound;[13] and (4) the prosecutor asked Dr. Seligson if Almeida was a gang member.[14] Almeida now claims that the court erred on these points. We disagree. Our review of the record shows the following: (1) the prosecutor's question concerning the knife incident was improper but harmless (the question was brief and no details of the incident were discussed); (2) the claim concerning the employer's statement was not preserved (Almeida did not object); (3) the discussion of Black Talon ammunition was relevant to show premeditation (the bullets would make death more likely); and (4) the prosecutor's question concerning Almeida's possible gang affiliation was fair inquiry (the witness had stated that a gang had targeted Almeida and was beating him up). Accordingly, we find the issue raised in the first part of this claim to be harmless error and the remainder of this claim to be without merit.
During redirect examination of State witness Louis Salmon, the following discussion transpired:
Q. Now, you said this was a crazy thing, an irrational act, is that what you said on cross examination?
A. Yes.
Q. I think you said he was paranoid?

*929 A. Yeah.
Q. Wasn't it your impression that Mr. Almeida knew that what he had done was wrong?
A. Yeah.
Q. In fact, in your words, he was a bad boy, so it's time for him to pay his dues?
MR. MOLDOF: I am going to object to that opinion.
THE COURT: It's overruled.
Q. (By Mr. Donnelly) In fact, it was your impression from him that he had been a bad boy, so it's time for him to pay his dues?
A. Yeah.
MR. MOLDOF: Objection, with regard to what Mr. Salmon thought.
THE COURT: It's overruled.
MR. MOLDOF: Motion to make.
Q. (By Mr. Donnelly) Is that not correct, Mr. Salmon?
A. Yeah.
Q. It was also your impression that he was prepared to face the consequences?
A. Yeah.
MR. MOLDOF: Same objection.
THE COURT: It's overruled.
THE WITNESS: Yeah.
MR. DONNELLY: Thank you, I have no further questions.
Almeida now claims that the court erred in overruling the defense objections. We disagree.
The above testimony related Salmon's opinion on three points: (1) Almeida knew that what he had done was wrong; (2) Almeida believed he had been a bad boy and it was time for him to pay his dues; and (3) Almeida was prepared to face the consequences. Generally, testimony is admissible on redirect that tends to clarify cross-examination testimony. See Tompkins v. State, 502 So.2d 415, 419 (Fla.1986). The present record shows that the above testimony was elicited following cross-examination by defense counsel that called for Salmon's opinion on virtually identical matters.[15] Thus, the above discussion was a fair response to Salmon's testimony on cross-examination.[16] We find no error.
The State introduced as Exhibit No. 10 an autopsy photo of the victim that depicted the gutted body cavity. Almeida claims that this was error. We agree. Although this Court has stated that "[t]he test for admissibility of photographic evidence is relevancy rather than necessity," Pope v. State, 679 So.2d 710, 713 (Fla. 1996), this standard by no means constitutes a carte blanche for the admission of gruesome photos. To be relevant, a photo of a deceased victim must be probative of an issue that is in dispute.[17] In the present *930 case, the medical examiner testified that the photo was relevant to show the trajectory of the bullet and nature of the injuries. Neither of these points, however, was in dispute. Admission of the inflammatory photo thus was gratuitous. We find the error harmless, however, in light of the minor role the photo played in the State's case. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
Almeida was picked up by police November 29, 1993, and taken to headquarters where he was read his rights, signed a waiver form, and then confessed to the murder of Frank Ingargiola. Detective Mink later sought to begin a formal recorded interrogation session and the following taped discussion transpired:
Q. Do you mind if we call you Ozzie during this, or do you prefer your own name?
A. That is okay.
Q. Ozzie's okay?
A. Okay.
Q. Can you read and write the English language?
A. Can I read English?
Q. Can you read and write the English language?
A. Yes.
Q. Did you graduate high school?
A. No, not yet. I was still finishing.
Q. All right. Prior to us going on this tape here, I read your Miranda rights to you, that is the form that I have here in front of you, is that correct? Did you understand all of these rights that I read to you?
A. Yes.
Q. Do you wish to speak to me now without an attorney present?

A. Well, what good is an attorney going to do?

Q. Okay, well you already spoke to me and you want to speak to me again on tape?
Q. (By Detective Allard) We are, we are just going to talk to you as we talked to you before, that is all.
A. Oh, sure.
Q. (By Detective Mink) Ozzie, this is a statement taken in reference to an incident that occurred at in front of Higgy's on November 15th, 1993, in the morning hours. Where the night manager by the name of Frank Ingargiola was shot in the parking lot, directly out in front of Higgy's. In your own words can you tell me what took place on this night and your involvement in this?
A. Yes. Me and a couple of friends went to Higgy's after work.
Almeida then confessed again to the Ingargiola murder (and to the murders of the two prostitutes, Marilyn Leath and Chiquita Counts). Almeida now claims that the court erred in failing to suppress the taped statement. The State, on the other hand, contends that this issue is controlled by State v. Owen, 696 So.2d 715 (Fla.1997). We disagree.
We recently addressed the admissibility of this taped statement in a companion case, Almeida v. State, 737 So.2d 520 (Fla. 1999) ("Almeida I") (addressing Almeida's conviction for the murder of Chiquita Counts). We first determined that Almeida's utterance ("Well, what good is an attorney going to do?") referred to his right to counsel and was a bona fide question calling for an answer, and we observed that this question was fundamentally different from the statement in Owen:
This scenario is not embraced within our holding in Owen. The type of utterance at issue in Owen was an equivocal statement whichpursuant to Davis required no clarification and could not trump the clear waiver of rights Owen had made earlier. The type of utterance at issue here, on the other hand, was an un equivocal question that was prefatory toand possibly determinative ofthe *931 invoking of a right and which cast doubt on the knowing and intelligent nature of the prior waiver. Detective Mink plainly asked Almeida if he wanted to proceed without a lawyer, and Almeida just as plainly asked the officer what good a lawyer would do. There was nothing equivocal about this exchange and certainly nothing unclear about Almeida's questionit was a simple, direct question, susceptible of but a single interpretation. Almeida very clearly was asking the officer for fundamental information concerning his right to counsel.
Almeida I, 737 So.2d at 524. We concluded that under Traylor v. State, 596 So.2d 957 (Fla.1992), police must make a good-faith effort to answer a clear question concerning a suspect's rights:
The Court in Traylor thus held that if a suspect indicates in any manner that he or she wants the help of a lawyer the interrogation must case. This proscription necessarily embraces a scenario such as the present, for the defendant here was seeking basic information on which to make an informed decision concerning his right to counsel. No valid societal interest is served by withholding such information. Indeed, both sides can only benefit from disclosure: Disclosure ensures that any subsequent waiver will be knowing and intelligent, and it reaffirms those qualities in a prior waiver.[18] Nondisclosure, on the other hand, is doubly harmful: It exacerbates the inherently coercive atmosphere of the interrogation session, and it places in doubt the knowing and intelligent nature of any waiverwhether prior or subsequent.
Accordingly, we hold that if, at any point during custodial interrogation, a suspect asks a clear question concerning his or her rights, the officer must stop the interview and make a good-faith effort to give a simple and straightforward answer. To do otherwisei.e., to give an evasive answer, or to skip over the question, or to override or "steamroll" the suspectis to actively promote the very coercion that Traylor was intended to dispel. A suspect who has been ignored or overridden concerning a right will be reluctant to exercise that right freely. Once the officer properly answers the question, the officer may then resume the interview (provided of course that the defendant in the meantime has not invoked his or her rights). Any statement obtained in violation of this proscription violates the Florida Constitution and cannot be used by the State. See Traylor, 596 So.2d at 966
Almeida I, 737 So.2d at 525. Finally, we held that police should have answered Almieda's question:
In the present case, we conclude that Detective Mink should have made an honest effort to answer Almeida's question concerning his right to counsel. Both Almeida and the State would have benefitted from the dissemination of basic, common sense information concerning this right. Instead, by ignoring the question and continuing the interrogationi.e., by "steamrolling" the defendantthe officers did two things. First, they exacerbated the inherently coercive atmosphere of the interrogation session. (How could Almeida feel free to exercise his rights when police had just overridden his question concerning those rights?) And second, they placed in doubt the validity of the prior waiver. (How could Almeida have knowingly and intelligently waived his rights earlier if he did not know "what good ... an attorney [is] going to do?")
Almeida I, 737 So.2d at 525. Because we were unable to say beyond a reasonable doubt that the erroneous admission of the taped statement in Almeida I did not contribute to the verdict, we reversed Almeida's conviction for the murder of Chiquita Counts. Id. at 14, at 523.
*932 The present case is differentthe conviction here is supported by copious evidence in addition to the improperly admitted taped statement: The record shows that as well as confessing on tape, Almeida also confessed to Detective Mink prior to giving the taped statement ("he just threw his hands up and said, I fucking killed him"); Almeida also confessed to Louis Salmon, Eddie Cooper, and Sergio Hoggro, all of whom testified at trial; and the gun found in Almeida's car when he was arrested was conclusively identified as the murder weapon. We conclude on this record that there is no reasonable possibility that admission of the taped statement affected the verdict. See State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986) ("The question is whether there is a reasonable possibility that the error affected the verdict."). We find the error harmless.
In his next claim, Almeida notes that during the course of these proceedings, defense counsel brought three points to the court's attention: (1) Prior to trial, a woman accompanying the victim's wife allegedly said to the defendant, "You should fry, you bastard;" (2) during the medical examiner's testimony at trial, the victim's mother allegedly began to cry; and (3) during Dr. Macaluso's testimony, someone in the audience allegedly made a sarcastic remark ("Who cares."). Almeida now claims that the court erred in failing to grant a mistrial based on these incidents. We disagree. The record shows the following: (1) The jury was not exposed to the pretrial comment; (2) although neither the prosecutor nor the judge heard the mother sobbing, the court offered to give a curative instruction;[19] and (3) although neither the judge nor the bailiff, who was sitting "right there," heard the "who cares" comment, the court instructed the bailiff to tell the spectators to refrain from making such comments. We find no error. See generally Gorby v. State, 630 So.2d 544 (Fla.1993).
Almeida claims that the trial court erred in finding that CCP was established. We agree. A trial court's ruling on an aggravating circumstance will be sustained on review as long as the court applied the right rule of law and its ruling is supported by competent substantial evidence in the record. See Willacy v. State, 696 So.2d 693 (Fla.1997). Competent substantial evidence is tantamount to legally sufficient evidence, and we assess the record evidence for its sufficiency only, not its weight.[20]
The present record shows the following: (1) Several witnesses testified that *933 Almeida had calmed down in the hours following the incident at Higgy's and evinced no plan to commit the crime; (2) the trial court found that Almeida had a history of alcohol abuse and had been drinking on the night of the crime; (3) Almeida in his own statement to police described the killing as an impulsive act committed shortly after he had left his friends and got drunk by himself; (4) the trial court found that both mental health mitigators had been established, i.e., that Almeida was extremely disturbed at the time of the crime and that his capacity to appreciate the criminality of his conduct was substantially impaired; (5) the record is replete with testimony of witnesses attesting to Almeida's lack of impulse control due to his brutal childhood in Brazil; (6) witnesses established that Almeida was particularly unstable at the time of the crime because of his recent marital separation and pending divorce. In light of these circumstances, we conclude that the record evidence is legally insufficient to support a finding of heightened premeditation. Accordingly, the court erred in finding CCP.
Almeida next claims that his death sentence is disproportionate. We agree. The Court in State v. Dixon, 283 So.2d 1 (Fla.1973), held that the death penalty is reserved for only the most indefensible of crimes:
Review of a sentence of death by this Court ... is the final step within the State judicial system. Again, the sole purpose of the step is to provide the convicted defendant with one final hearing before death is imposed. Thus, it again presents evidence of legislative intent to extract the penalty of death for only the most aggravated, the most indefensible of crimes.
Id. at 8. We later explained: "Our law reserves the death penalty only for the most aggravated and least mitigated murders." Kramer v. State, 619 So.2d 274, 278 (Fla.1993).[21] Thus, our inquiry when conducting proportionality review is twopronged: We compare the case under review to others to determine if the crime falls within the category of both (1) the most aggravated, and (2) the least mitigated of murders.
In the present case, as noted above, only a single aggravator (commission of a prior violent felony) applies. As a general rule, "death is not indicated in a single-aggravator case where there is substantial mitigation." Jones v. State, 705 So.2d 1364 (Fla.1998). Nevertheless, this Court has affirmed the death penalty in single-aggravator cases where a prior murder was involved. See, e.g., Ferrell v. State, 680 So.2d 390 (Fla.1996) (affirming death sentence where sole aggravator was prior second-degree murder); Duncan v. State, 619 So.2d 279 (Fla.1993) (affirming death sentence where sole aggravator was prior second-degree murder).[22] The present case involves two prior first-degree murders. Thus, the first prong of the above standard appears to be satisfied.
The trial court additionally found three statutory and many nonstatutory mitigators, including a brutal childhood and vast mental health mitigation. This Court has reversed the death penalty in cases where the extent of mitigation was comparable or less, even in the face of significant aggravation. See, e.g., Robertson v. State, 699 So.2d 1343 (Fla.1997); Nibert v. State, 574 So.2d 1059 (Fla.1990); Fitzpatrick v. State, 527 So.2d 809 (Fla.1988). In addition to the mental health mitigation in the present case, the defendant was twenty years old at the time of the crime, and the present crime and the prior capital felonies all arose from a single brief period of marital crisis that spanned six weeks. We *934 note that the jury vote was seven to five. On this record, we cannot conclude that the present crime is one of the least mitigated murders. In fact, the record shows just the oppositei.e., that this is one of the most mitigated murders the Court has reviewed. Accordingly, we find Almeida's death sentence disproportionate.[23]
Based on the foregoing, we affirm Almeida's conviction and vacate his death sentence. We remand for imposition of a life sentence without possibility of parole for twenty-five years.
It is so ordered.
ANSTEAD and PARIENTE, JJ., and KOGAN, Senior Justice, concur.
HARDING, C.J., concurs in part and dissents in part with an opinion, in which WELLS, J., and OVERTON, Senior Justice, concur.
HARDING, C.J., concurring in part and dissenting in part.
I would affirm the conviction and sentence of death in this case. I disagree with the majority's opinion for several reasons. First, I disagree that the trial court erred in admitting Almeida's taped confession. Second, I believe that the record supports a finding of CCP. Finally, I do not think that the death sentence is disproportionate.

I. Almeida's confession
I disagree with the majority's conclusion that the trial court erred in admitting Almeida's taped statement. For the reasons expressed in my dissenting opinion in Almeida v. State, 737 So.2d 520 (Fla. 1998), I would find that Almeida's statement was admissible under Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), and State v. Owen, 696 So.2d 715 (Fla.1997).

II. CCP
I also disagree with the majority's conclusion that the cold, calculated, and premeditated aggravating factor (CCP) should be stricken. In a well-reasoned sentencing order, the trial judge set forth the basis for finding CCP in this case:
The evidence at trial revealed that on November 14, 1993, the manager of Higgy's restaurant and bar grabbed a beer from the defendant to prevent him from drinking because he was underage. Mr. Ingargiola had previously kicked the defendant out of the restaurant for drinking alcohol and told him not to do it again. The defendant, wanting to beat up the victim, attempted to lure him outside by claiming that he had identification in his car; however, Mr. Ingargiola refused to accompany him to the parking lot. The defendant and his friend, Louis Salmon, left the restaurant, at which time Mr. Salmon tried to calm the enraged defendant. They then drove to Regas' restaurant, where they picked up two other friends. Mr. Almeida drove the three men to Mr. Salmon's house, where Mr. Salmon spent over an hour and a half attempting to calm down the very angry defendant and try to talk him out of killing Mr. Ingargiola. The defendant insisted that Mr. Salmon could not talk him out of doing this. Finally, the defendant left Mr. Salmon's house and dropped off the other two men at their respective homes. He then, in his own words, got drunk and returned to Higgy's, where he waited in the parking lot until Mr. Ingargiola finished closing up the restaurant. As the victim walked to his car, the defendant drove by and shot him at close range with a Magnum .44 revolver loaded with Black Talon ammunition.
The very fact that the defendant returned to the restaurant and waited until 4:30 in the morning for the victim to *935 emerge so that he could shoot him provides ample support for the finding that the homicide was committed in a cold, calculated and premeditated manner. The defendant literally was lying in wait for his victim, thereby evidencing the absence of frenzy or panic as well as supporting the calculating nature of the crime. In addition, the Court finds the "heightened premeditation" element exists from the fact that despite Mr. Salmon's best efforts to dissuade the defendant from committing the crime, Mr. Almeida insisted that he would not be talked out of killing Mr. Ingargiola.
The defendant told Dr. Macaluso, one of the examining psychiatrist, that he felt Mr. Ingargiola deserved to be shot. He also bragged to several co-workers at Regas' about committing the killing and how he and an underage co-worker could now drink beer at Higgy's. Yet in his statement to the police, the defendant claimed there was no reason for killing Mr. Ingargiola. None of these statements comports with a moral or legal justification for the crime, particularly when this was the third homicide the Defendant committed within a six week period. Therefore, the Court finds no claim of justification or excuse that would rebut the otherwise cold and calculating nature of this homicide. Banda v. State, 536 So.2d 221 (Fla.1988).
Based on the foregoing, the Court finds that this aggravating factor exists beyond and to the exclusion of every reasonable doubt.
I agree with the trial judge that there was sufficient evidence to find beyond a reasonable doubt that the CCP aggravating factor exists.
In Jackson v. State, 648 So.2d 85, 89 (Fla.1994), this Court outlined the necessary elements for a finding of CCP: (1) the murder was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage, (2) the defendant had a careful plan or prearranged design to commit murder before the killing, (3) the defendant exhibited heightened premeditation, and (4) the defendant had no pretense of legal or moral justification. In striking CCP, the majority opinion states:
The present record shows the following: (1) Several witnesses testified that Almeida had calmed down in the hours following the incident at Higgy's and evinced no plan to commit the crime; (2) the trial court found that Almeida had a history of alcohol abuse and had been drinking on the night of the crime; (3) Almeida in his own statement to police described the killing as an impulsive act committed shortly after he had left his friends and got drunk by himself; (4) the trial court found that both mental mitigators had been established, i.e., that Almeida was extremely disturbed at the time of the crime, and that his capacity to appreciate the criminality of his conduct was substantially impaired; (5) the record is replete with testimony of witnesses attesting to Almeida's lack of impulse control due to his brutal childhood in Brazil; (6) witnesses established that Almeida was particularly unstable at the time of the crime because of his recent marital separation and pending divorce. In light of these circumstances, we conclude that the record evidence is legally insufficient to support a finding of heightened premeditation. Accordingly, the court erred in finding CCP.
I respectfully disagree. The majority's bare-boned analysis of this issue is neither pertinent to the matter of heightened premeditation nor is it supported by case law.
In Clark v. State, 609 So.2d 513, 515 (Fla.1992), this Court stated, "To establish the heightened premeditation necessary for a finding of [CCP], the State must demonstrate that the defendant had a careful plan or prearranged design to kill." The facts in the present case reveal that after being kicked out of the restaurant, Almeida attempted to lure the victim outside in order to confront him. When this *936 failed, Almeida told his friends of his intent to kill the victim. Almeida later returned to the restaurant and waited until 4:30 a.m. for the victim to exit the restaurant, whereupon Almeida shot and killed the victim. All of this demonstrates that Almeida had a careful plan and prearranged design to murder the victim. On this record, I fail to see how the majority can conclude that the facts are insufficient to support a finding of heightened premeditation.

III. Proportionality of the Death Sentence
Finally, I disagree with the majority that the death penalty is disproportionate in this case. The trial judge found that two aggravating factors were established in this case: (1) CCP and (2) the defendant was previously convicted of another capital felony (the Leath and Counts murders). The trial judge found that three statutory mitigating factors were established in this case and gave each little weight: (1) age of the defendant, (2) influence of extreme or emotional disturbance, and (3) impaired capacity to appreciate criminality of conduct and conform conduct to the requirements of the law. The trial judge found that eight nonstatutory mitigating factors were established and assigned them some, little, or very little weight.
In reaching its conclusion regarding proportionality, the majority did not consider CCP. As stated earlier, I disagree with the majority that CCP was not established in this case. Even without CCP, I still would find that the death penalty is proportionate in this case. This Court has previously upheld the death penalty in single aggravator cases. See Ferrell v. State, 680 So.2d 390, 391 (Fla.1996); Duncan v. State, 619 So.2d 279, 284 (Fla.1993). In Ferrell, this Court stated:
In the present case, although the court found a number of mitigating circumstances established, it assigned little weight to each. The lone aggravating circumstance, on the other hand, is weighty. The prior violent felony Ferrell was convicted of committing was a second-degree murder bearing many of the earmarks of the present crime....
680 So.2d at 391. Similarly, in the present case, although the court found that a number of mitigating circumstances were established, it assigned little or very little weight to each, with the exception of the nonstatutory mitigator of difficult childhood, which was given some weight. In contrast, the aggravator in question is very weighty, especially in light of the fact that both previous first-degree murders were committed within five weeks of the present case.
If the majority believes that the trial court abused its discretion in weighing the aggravators and mitigators, then this should be explicitly stated in the opinion. But based on this record and the trial court's findings in the sentencing order, it cannot be said that the death penalty is disproportionate.
Accordingly, I would affirm the conviction of guilt and sentence of death in this case.
WELLS, J., and OVERTON, Senior Justice, concur.
NOTES
[1] Almeida was born in Boston and was taken by his father to live in Brazil when he was five years old. The father married a sixteen or seventeen year old Brazilian and Almeida was starved, beaten, and sexually abused while in her care. Dr. Seligson, a mental health expert, testified: "My understanding is that the stepmother who was, I think she was 17 or 16 when she married Osvaldo's father, who was about almost 30 years older than her, she and her sister would take and strip Osvaldo and they would beat him. And there were times when broomsticks were broken [on him] and he would be thrown outside without food. The father would come home and beat him." Dr. Seligson continued: "[The stepmother] had, I believe, it was a cousin or brother who raped Osvaldo on at least one or two occasions, penetrated him anally when he was about 7 years old. There was also a maintenance worker who lived in the area.... He also sexually molested this individual. Nothing was done. And in the meantime he was being beaten and starved." Almeida's mother visited him in Brazil when he was twelve years old and was shocked by his condition. She tried to intervene: "He was very skinny, he didn't want to speak, pieces [had been cut] from his body. I got a lawyer that was in Brazil, I got a lawyer." Almeida returned to live in the United States the next year and was listless and unrecognizable to his sister: "[W]hen I first saw Ozzie, I didn't recognize him.... To me, it seemed like he was, he had been through the war, like it reminded me of like one of the children in the concentration camp[s].... He wasn't clothed right, he was malnourished, he was skinny, he looked like a skeleton, I just couldn't understand that [it] was even him in there."
[2] Dr. Strauss, a psychiatrist, testified for the defense that Almeida was insane in November 1993 and could not understand the consequences of his actions, and Dr. Seligson, a psychologist, testified that Almeida is schizophrenic and could not distinguish right from wrong.
[3] Dr. Block-Garfield, a psychologist, testified that although Almeida has mental and emotional difficulties, he could distinguish right from wrong, and Dr. Macaluso, a psychiatrist, testified that Almeida was suffering from dysthymic disorder, a chronic depressive condition, but that at the time of the crime he knew right from wrong.
[4] He shot the prostitutes because they ridiculed and insulted him when they got out of his car and haggled over money.
[5] Dr. Bukstel, a neuropsychologist, testified that Almeida has a mixed personality disorder with paranoid features, and at the time of the crime was in a serious depression and under the influence of extreme mental or emotional disturbance. Dr. Macaluso, the psychiatrist who testified for the State during the guilt phase, testified that Almeida suffered from dysthymic disorder and active alcoholism, and was under the influence of extreme mental or emotional disturbance at the time of the crime. And Dr. Strauss testified again for the defense, opining that Almeida suffered from dysthymia, posttraumatic stress disorder, mixed personality problems, and alcoholrelated problems. Dr. Strauss believed that at the time of the crime, Almeida was under the influence of extreme mental or emotional disturbance and his capacity to appreciate the criminality of his conduct was substantially impaired.
[6] The court found that Almeida had previously been convicted of another capital felony and that the present crime was committed in a cold, calculated, and premeditated manner (CCP).
[7] The court found the following statutory mitigators: (1) age (Almeida was twenty years old at the time of the crime); (2) extreme emotional disturbance; and (3) impaired capacity.
[8] The court found the following nonstatutory mitigators: (1) capacity for rehabilitation; (2) good behavior while incarcerated; (3) cooperation with police after arrest; (4) confession to police; (5) alcohol abuse; (6) difficult childhood and physical abuse; (7) remorse; and (8) genuine religious beliefs.
[9] Almeida claims that the court erred in addressing the following matters: (1) the State's closing argument concerning burden of proof for insanity; (2) the admission of irrelevant or prejudicial evidence; (3) the admission of improper opinion testimony; (4) photograph of the victim; (5) motion to suppress; (6) emotional reaction of victim's family; (7) CCP; (8) proportionality; (9) the evaluation of mitigating evidence; (10) the State's argument concerning mitigation and court's instruction on mitigation; (11) the State's asking the defense mitigation expert whether the defendant met the legal standard for insanity; (12) the court's giving of advice to the defendant regarding his right to address the jury; (13) the weight given to the jury's recommendation of death; (14) a presumption favoring death in the sentencing order; and (15) refusing to allow life without parole as a sentencing option.
[10] The State claims that the court erred in refusing to allow the State to introduce evidence of Almeida's two prior murder convictions during the guilt phase.
[11] On redirect examination of State witness Louis Salmon, the following transpired:

Q. (By Mr. Donnelly) The paranoia you talked about, you said that was after this incident?
A. Yeah.
Q. Is that when you were threatened?
A. Yeah.
Q. Was that the incident with the knife you are talking about with Mr. Almeida?
A. No, that was before.
Q. That was before?
A. Yeah.
MR. MOLDOF: Objection, a motion to make with regard to that as well.
Q. (By Mr. Donnelly) So this is another incident afterwards where he threatened you?
A. Yeah.
[12] The prosecutor asked State witness Mike Turner on direct if Almeida had ever discussed killing someone, and the following transpired:

Q. Did you ever have a conversation with Mr. Almeida regarding killing someone?
A. Yes, I did.
Q. What did Mr. Almeida tell you with respect to killing someone?
A. He told me he had had visions of doing that before and felt no remorse or guilt for that, that he could think about killing someone and go to bed at night and not even think twice about it.
MR. DONNELLY: Thank you. I have no further questions, Your Honor.
[13] On direct examination of Mr. Salmon, the following transpired:

Q. Did Mr. Almeida ever have any discussion with you about the type of ammunition he uses in that gun, or that he used in that gun?
A. Yeah.
MR. MOLDOF: Objection to relevance and time and place.
THE COURT: Could we be a little bit more specific?
MR. DONNELLY: Certainly, Judge.
Q. (By Mr. Donnelly) Did Mr. Almeida tell you the type and make of ammunition he had in the gun when he shot the manager at Higgy's?
A. No, he didn't, no.
Q. Did you ever have a discussion about Black Talon ammunition?
MR. MOLDOFF: Objection, motion to make.
At sidebar, defense counsel argued that Salmon did not know that Black Talon cartridges were in Almeida's gun on the day of the murder. The court overruled the objection, and the following testimony took place:
Q. Did Mr. Almeida ever tell you what effect that ammunition would have?
A. Yeah.
Q. What did he tell you?
A. He tell me, you know, it makes a small hole when it enters the body, makes a big hole when it comes out, you know.
[14] On cross-examination of defense witness Dr. Seligson, the following transpired:

Q. And the delusions [Almeida experienced] were what?
A. Paranoid delusions that people were out to get him, that people were going to harm him.
Q. That people were out to get him. What information do you possess in the documents that you reviewed that people were out to get him that led you to think that he was suffering delusions?
A. When I looked at the coworkers' they talked about him always being on guard with people, that he would overreact when people might say something to him as if they were going to attack him.
I also talked with him about his concerns when he was beaten as a child, all of these kinds of things, contributed. He was always on guard. He did not trust people. I think there was also reference made when I spoke with one of the family members that he had also been the target of a gang that was beating him up when he was an adolescent.
Q. He was in a gang though?
A. I don't know if he was or not.
MR. MOLDOF: Judge, I have an objection and a motion to make.
Q. (By Mr. Donnelly) And so the delusions are that he was on guard, is that right, against whom?
A. Mostly anyone. He was defensive. He was frightened of most anyone.
[15] For instance, defense counsel asked the following questions on cross-examination: "And that's because you were looking out for Ozzie, because he acted like a kid, correct?"; "You treated him like a kid because he was big and he seemed like he didn't understand the consequences of what was going on, correct?"; "You thought Mr. Almieda acted pretty crazy on November 14th or 15th, that night when [he] told you what he did, didn't you?"; "You thought he acted irrationally doing what he did?"; "Was it your impression that Mr. Almeida was becoming paranoid, isn't that the term you used?"; "And now, Mr. Salmon, with respect to Mr. Almeida's behavior, especially the behavior that you were observing that night on November 14th, 1993, can you tell the ladies and gentlemen of the jury if you thought that behavior was just an act, if you will, or just an attempt to, you know, look a certain way?"
[16] See also Strausser v. State, 682 So.2d 539 (Fla.1996) ("[I]t is a well established principle of law in this state that an otherwise qualified witness who is not a medical expert can testify about a person's mental condition, provided the testimony is based on personal knowledge or observation.)" Id. at 541 (quoting Rivers v. State, 458 So.2d 762, 765 (Fla. 1984)).
[17] See McCormick on Evidence 773 (John William Strong, ed., 4th ed. 1992) ("There are two components to relevant evidence: materiality and probative value. Materiality looks to the relation between the propositions for which the evidence is offered and the issues in the case. If the evidence is offered to help prove a proposition which is not a matter in issue, the evidence is immaterial." (Footnote omitted)).
[18] See Traylor v. State, 596 So.2d 957, 966 (Fla.1992) ("A waiver of a suspect's constitutional rights must be voluntary, knowing, and intelligent.").
[19] The court stated: "Your motion for mistrial is denied. If you want me to give any type of instruction to the jury, I'll be more than happy to do so."
[20] This Court in Tibbs v. State, 397 So.2d 1120 (Fla.1981), explained:

The weight and the sufficiency of evidence are, in theory, two distinct concepts most often relevant at the trial court level. Sufficiency is a test of adequacy. Sufficient evidence is "such evidence, in character, weight, or amount, as will legally justify the judicial or official action demanded." In criminal law, a finding that the evidence is legally insufficient means that the prosecution has failed to prove the defendant's guilt beyond a reasonable doubt. Weight, at least in theory, is a somewhat more subjective concept. The "weight of the evidence" is the "balance or preponderance of evidence." It is a determination of the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other.
As a general proposition, an appellate court should not retry a case or reweigh conflicting evidence submitted to a jury or other trier of fact. Rather, the concern on appeal must be whether, after all conflicts in the evidence and all reasonable inferences therefrom have been resolved in favor of the [ruling] on appeal, there is substantial, competent evidence to support the [ruling]. Legal sufficiency alone, as opposed to evidentiary weight, is the appropriate concern of an appellate tribunal.
Id. at 1123 (citations and footnotes omitted). See also Terry v. State, 668 So.2d 954, 964 (Fla.1996) ("[A] defendant's claim of insufficiency of the evidence cannot prevail where there is substantial competent evidence to support the verdict and judgment.").
[21] See also Robertson v. State, 699 So.2d 1343 (Fla.1997).
[22] See also Lindsey v. State, 636 So.2d 1327 (Fla.1994) (affirming both death sentences in double homicide where sole aggravator to support one of the death sentences was prior second-degree murder).
[23] We find the remainder of Almeida's claims to be moot, and the cross-appeal raised by the State to be without merit