PER CURIAM.
This case is before the Court on appeal from a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.
I. OVERVIEW
On March 7,1990, Lancelot Uriley Armstrong was indicted for the February 17, 1990, first-degree shooting murder of Deputy Sheriff John Greeney, attempted murder of Deputy Sheriff Robert Sallustio, and armed robbery. The jury returned a guilty verdict and recommended a sentence of death by a vote of nine to three. On direct appeal, we affirmed Armstrong’s convictions and sentence of death. Armstrong v. State (Armstrong I), 642 So.2d 730 (Fla.1994).
Armstrong filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850, which was denied. On appeal, this Court affirmed the denial of collateral relief on the guilt phase issues, but vacated Armstrong’s death sentence and remanded for a new penalty phase after concluding that one of Armstrong’s prior violent felony aggravators had since been invalidated. Armstrong v. State (Armstrong II), 862 So.2d 705, 715 (Fla.2003).
On April 16, 2007, Armstrong’s new penalty phase commenced. On April 25, 2007, the jury again recommended death by a vote of nine to three. Following a Spencer [1] hearing, the trial court found the existence of three aggravators, one statutory mitigator, and four nonstatutory miti- *161 gators and imposed a sentence of death. This appeal followed.
Armstrong raises four issues below. The State raises a fifth issue: proportionality. For the reasons expressed below, Armstrong is not entitled to relief.
II. FACTS AND PROCEDURAL HISTORY
The facts of Armstrong’s crimes are laid out in this Court’s opinion on Armstrong’s first direct appeal:
In the early morning hours of February 17, 1990, Armstrong called a friend and asked him to go with him to rob Church’s Fried Chicken restaurant. The friend refused. According to several employees of Church’s, around two o’clock that same morning, Armstrong and Michael Coleman came to the restaurant asking to see Kay Allen, who was the assistant manager of the restaurant and Armstrong’s former girlfriend. The restaurant employees testified that Allen did not want to see Armstrong and asked him to leave. Armstrong and Coleman, however, remained at the restaurant and eventually Allen accompanied Armstrong to the vehicle he was driving while Coleman remained inside the restaurant. The employees additionally testified that Allen and Armstrong appeared to be arguing while they were sitting in the vehicle.
Allen testified that, while she was in the car with Armstrong, he told her he was going to rob the restaurant, showed her a gun under the seat of the car, and told her he might have to kill her if she didn’t cooperate. Coleman then came out to the car, and Armstrong, Coleman, and Allen went back into the restaurant. Allen was responsible for closing the restaurant, and by this time, the other employees had left. Coleman and Armstrong ordered Allen to get the money from the safe. Before doing so, she managed to push the silent alarm. Shortly thereafter, Armstrong returned to the car. Coleman remained in the restaurant with Allen to collect the money from the safe.
Other testimony reflected the following facts. When the alarm signal was received by the alarm company, the police were notified and Deputy Sheriffs Robert Sallustio and John Greeney went to the restaurant where they found Armstrong sitting in a blue Toyota. Greeney ordered Armstrong out of the car and told him to put his hands on the car. After Greeney ordered Armstrong to put his hands on the car, Greeney holstered his gun to “pat down” Armstrong. Sallustio then noticed movement within the restaurant, heard shots being fired from the restaurant and from the direction of the car, and felt a shot to his chest. Apparently, when the movement and shots from the restaurant distracted the officers, Armstrong managed to get his gun and began firing at the officers.
According to Allen, when Coleman noticed that police officers were outside the building, he started firing at the officers. Allen took cover inside the restaurant, from where she heard Coleman firing more shots and heard a machine gun being fired outside the restaurant. Sallustio was shot three times, but still managed to run from Armstrong and radio for assistance. When other officers arrived, they found Greeney dead at the scene. Greeney had died instantly. Allen was found inside the restaurant; Coleman and Armstrong had fled.
That same day, Armstrong told one friend that he got shot and that he returned a shot; he told his girlfriend that a police officer had asked him to step out of his car and that, when he did so, *162 the officer pulled a gun on him and tried to shoot him; and he told another friend that someone shot him while trying to rob him. Thereafter, Armstrong and Coleman fled the state but were apprehended the next day in Maryland. Before being apprehended, Armstrong had two bullets removed from his arm by a Maryland doctor.
A number of shell casings were recovered from the scene. All of the bullets removed from Sallustio and Greeney were fired from a nine-millimeter, semiautomatic weapon; Greeney had been shot from close range. Evidence reflected that Armstrong had purchased a nine-millimeter, semi-automatic weapon the month before the crime. Armstrong’s prints were found in the blue Toyota as well as on firearm forms found in the car. Additional ballistics evidence reflected that the shots fired from the restaurant did not come from a nine-millimeter, semi-automatic weapon. This indicated that only someone near the car could have fired the shots that wounded Sallustio and killed Greeney. Additionally, testimony was introduced to show that Armstrong was seen with a nine-millimeter, semi-automatic gun right after the incident. Armstrong was convicted as charged.[n.1]
At the penalty phase, the State presented evidence showing Armstrong’s prior conviction of indecent assault and battery on a fourteen-year-old child. Armstrong presented evidence from a number of witnesses in support of the following nonstatutory mitigating circumstances: (1) he had significant physical problems during childhood (he was dyslexic but a good student and had a brain hemorrhage when he was a baby); (2) helped others and had a positive impact on others (routinely assisted his grandmother, brothers and sisters, both financially and emotionally; was a good father and provider to his son; trained others to do carpentry work and was a positive influence on those he assisted); (3) was present as a child when his mother was abused and would come to her aid; (4) could be productive in prison (was an excellent carpenter and plumber); (5) is a good prospect for rehabilitation; (6) codefendant received a life sentence; (7) the alternative sentence is life imprisonment without the possibility of parole; (8) Armstrong is religious (attends church); and (9) Armstrong failed to receive adequate medical care and treatment as a child (had a brain hemorrhage when he was a baby but, due to finances, did not receive the medical attention he needed).
The jury recommended death by a nine-to-three vote. The trial judge found no statutory mitigating circumstances and four aggravating circumstances: (1) prior conviction of a violent felony; (2) committed while engaged in the commission of a robbery or flight therefrom; (3) committed for the purpose of avoiding arrest or effecting an escape from custody; and (4) murder of a law enforcement officer engaged in the performance of official duties. The trial judge sentenced Armstrong to death for the murder of Officer Greeney, to life imprisonment for the attempted murder of Officer Sallustio, and to life imprisonment for the armed robbery.
Armstrong I, 642 So.2d at 733-34. On direct appeal, Armstrong raised twenty-four issues, nine of which pertained to the guilt phase and fifteen of which pertained to the penalty phase. Id. at 734. This Court affirmed Armstrong’s convictions and sentences. Id. at 739.
*163 Armstrong’s Rule 3.850 Proceedings and Appeal
On April 20, 2000, Armstrong filed an amended rule 3.850 motion for postconviction relief. Armstrong raised thirty-four issues. After a Huff[2] hearing, the post-conviction court summarily denied thirty-two of the claims and granted an evidentia-ry hearing on the following two claims: (1) that Armstrong’s death sentence was predicated on a since-vacated prior violent felony conviction, and (2) ineffective assistance of counsel regarding the investigation and presentation of mitigating evidence during the penalty phase trial. After the eviden-tiary hearing, the trial court entered a final order denying relief on all claims. Armstrong appealed the postconviction court’s denial of his rule 3.850 motion and petitioned this Court for a writ of habeas corpus.
On appeal, Armstrong raised sixteen claims alleging that he was entitled to postconvietion relief for various issues relating to both the guilt and penalty phase trial below. In his first penalty phase claim, Armstrong alleged that he was entitled to relief because his sentence of death was based on a prior violent felony conviction that was subsequently invalidated. Pursuant to Johnson v. Mississippi, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), this Court agreed. Therefore, this Court affirmed all issues relating solely to the guilt phase trial, but vacated the death sentence and remanded the case for a new penalty phase and resentencing. Armstrong II, 862 So.2d at 721.
Armstrong’s New Penalty Phase
Prior to the new penalty phase, the State filed a motion in limine seeking to preclude Armstrong from presenting testimony, evidence, or any arguments concerning Armstrong’s innocence pursuant to Preston v. State, 607 So.2d 404, 411 (Fla.1992) (explaining that such arguments would be considered improper). The trial court granted the motion, but permitted Armstrong to challenge the extent of his involvement in the robbery and homicide based on the mitigating circumstances he raised. Armstrong claimed the mitigation revealed that Coleman was the shooter and that Armstrong’s involvement in the crime was minor and a result of his acting under duress.
Pursuant to this Court’s mandate, jury selection for the capital resentencing hearing began on April 10, 2007. On April 11, 2007, the jury panel was accepted. During jury selection, the State and defense resolved a defensive challenge for cause by agreement to excuse the challenged juror.
On April 16, 2007, the panel was sworn in and the evidentiary portion of the penalty phase proceeded. At the conclusion of the new penalty phase trial, the trial court instructed the jury that its recommendation should either be for: (1) death, or (2) life imprisonment without the possibility of parole for 25 years. Specifically, the trial court instructed: “If you find the aggravating circumstances do not justify the death penalty, your advisory sentence should be one of life imprisonment without possibility of parole for twenty-five (25) years.” The trial court further instructed the jury, “If a majority of the jury determine that Lancelot Armstrong should be sentenced to death, your advisory sentence will be a majority of the jury by a vote of blank to blank, advised, recommend to the Court that it impose the death penalty upon Lancelot Armstrong.” Additionally, the trial court instructed:
On the other hand, if by six or more votes the jury determines that Lancelot Armstrong should not be sentenced to *164 death, your advisory sentence would be, the jury advises and recommends to the Court by a vote of blank to blank that it impose a sentence of life imprisonment to Lancelot Armstrong without the possibility of parole for 25 years.
The written instruction was consistent with the verbal instruction.
The trial evidence revealed that Armstrong was originally incarcerated in 1990 and sentenced in 1991. After jury deliberations began, the jury submitted a question, asking, “Will the 17 yrs he served be included in his 25 yrs sentence?” The trial court relayed the jury question to counsel, stating, “Will the 17 years he served be included in his sentence?”
After considering the arguments presented, the trial court stated:
THE COURT: I’m troubled by the language in the Downs [v. State, 572 So.2d 895 (Fla.1990),] case because in the Downs case says under the facts presented we find that the trial court did not use the discretion.
State argued that the Downs case created issue decision because he said, quote stands 25 more years. We haven’t heard that here. They have narrowly by this case permitted the response.
Ultimately, the jury was instructed as follows: “The defendant will receive credit for the time served on this charge.”
On April 25, 2007, the jury again recommended a sentence of death by a vote of nine to three.
Nelson[3] Hearing
On May 31, 2007, Armstrong filed a “motion to discharge counsel of record and appoint counsel outside of Public Defender’s office.” On June 14, 2007, based on the contents of that motion, the trial court held a “modified” Nelson hearing. There, Armstrong announced the names of the witnesses he alleged to have asked counsel to contact, and complained that counsel had not provided him with a copy of the postconviction evidentiary hearing transcript. The matter was taken under advisement. On July 2, 2007, the trial court denied the motion to discharge counsel.
Spencer Hearing
On September 7, 2007, the trial court conducted a Spencer hearing. During the Spencer hearing, Armstrong presented testimony from (1) David Massar, a crime filmmaker who came to know Armstrong through a prison pen pal program; (2) Avia Joy McKenzie, a woman who befriended Armstrong after he was incarcerated and testified that Armstrong was there for her when her daughter died in 1996; and (3) Armstrong. However, at that time, Armstrong made several comments that were clearly an attempt to relitigate the 1991 guilt phase, the new penalty phase proceedings, the presentation of mitigation, and the motion to discharge counsel. The trial court categorized Armstrong’s comments as a hybrid Muhammad,[4] Boyd,[5] and Grim[6] claim. As a result, the trial court recessed. On October 7, 2007, the trial court entered an order resetting the Spencer hearing.
On November 15, 2007, and November 30, 2007, the trial court continued the Spencer hearing. Although the Spencer hearing concluded in November 2007, the trial court was unable to enter its sentencing order until 2009. The delay appears to *165 be the result of extensive transcription problems.
The August 7, 2009, Sentencing Order
On August 7, 2009, the trial court entered it order sentencing Armstrong to death. In its extensive sentencing order, the trial court found and afforded “great weight” to each of the following three aggravating circumstances: (1) the Defendant was convicted of another capital felony or of a felony involving the use or threat of violence to the person (prior violent felony); (2) the capital felony was committed while the Defendant was engaged or was an accomplice in the commission of or an attempt to commit the crime of robbery (robbery); and (3) the victim in this capital felony case was a law enforcement officer engaged in the performance of his duties.[7]
The trial court considered and rejected four statutory mitigators: (1) the Defendant has no significant history of prior criminal activity, (2) the age of the Defendant (Armstrong was 28 years old) at the time of the crime, (3) the Defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor, and (4) the Defendant acted under extreme duress or under the substantial domination of another person.
However, the trial court did find one statutory mitigator: (1) the existence of any other factors in the defendant’s background that would mitigate against the imposition of the death penalty. The trial court considered the following background mitigation under this statutory mitigator: (a) Armstrong was born and raised in an impoverished country (Jamaica) where living conditions were deplorable and there was a constant threat of erupting and escalating violence (little weight); (b) had a problematic health history as a child and suffered from dyslexia (little weight); (c) was a good prisoner and regularly attended religious ceremonies while incarcerated (little weight); (d) suffered abuse at the hands of his stepfather and his brother cut off a portion of his finger when he was working in the cane fields (some weight); and (e) assisted in raising his siblings in Jamaica (some weight).
Finally, the trial court found that four of the nonstatutory mitigating circumstances were applicable after considering whether Armstrong (1) had problems growing up because he was biraeial (little weight); (2) was a member of the police in Jamaica who assisted during times of rioting and political unrest (not applicable); (3) assisted and trained others for jobs and counseled young adults while in Boston and Florida (not applicable); (4) taught himself how to read and write while imprisoned (not applicable); (5) was suffering from a benign internal tumor, at the time of sentencing, the size of a golf ball which could turn into cancer in the future (not mitigating); (6) having been incarcerated for 18 years at that point, was deprived of seeing his children grow as a result of his incarceration (not mitigating); (7) was a kind, gentle man (not mitigating); (8) assisted the police in preventing the sale of drugs while in Massachusetts (nonexistent); (9) was a good businessman (rejected); (10) expressed sorrow for the death of Greeney and the shooting of Sallustio and for their families, but maintained that he did not *166 commit the crimes (no remorse); and (11) properly raised a residual or lingering doubt (not appropriate).
The trial court weighed the aggravating factors and the mitigating factors and found that “the aggravating circumstances in this case far outweigh the mitigating circumstances. The aggravating circumstances in this case are overwhelming.” Armstrong was again sentenced to death for his conviction of first-degree murder. He was also sentence to two consecutive life sentences for the attempted first-degree murder and armed robbery convictions.
This Appeal
In his second direct appeal following the completion of his new penalty phase and resentencing, Armstrong raises four issues: (1) whether the trial court abused its discretion in admitting into evidence a vial of blood or photographs of the victim that were taken at the scene of the crime and the medical examiner’s office, (2) whether the trial court abused its discretion in admitting into evidence the remaining bullet fragment of the three original bullet fragments, (3) whether the trial court abused its discretion when it instructed the jury on the terms of a life sentence or when it answered the jury’s question regarding credit for time served, and (4) cumulative error. The State raises proportionality as the fifth issue. Each of these issues is discussed below.
III. ANALYSIS
A. Vial of Blood and Photographs
First, Armstrong contends that the trial court abused its discretion in admitting a vial of blood and several photographs during his new penalty phase. “A trial court’s ruling on the admission of photographic evidence will not be disturbed absent a clear showing of abuse of discretion.” Davis v. State, 859 So.2d 465, 477 (Fla.2003) (citing Mansfield v. State, 758 So.2d 636, 648 (Fla.2000)). Below, we discuss the trial court’s admission of each of these items into evidence and conclude that the trial court did not abuse its discretion.
Photographs, like all other evidence, are subject to the section 90.403, Florida Statutes (1989), balancing test. Pursuant to section 90.403, “Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.” § 90.403, Fla. Stat.
In Czubak v. State, 570 So.2d 925 (Fla.1990), this Court discussed the admissibility of gruesome photographs:
This Court has long followed the rule that photographs are admissible if they are relevant and not so shocking in nature as to defeat the value of their relevance. Where photographs are relevant, “then the trial judge in the first [instance] and this Court on appeal must determine whether the gruesomeness of the portrayal is so inflammatory as to create an undue prejudice in the minds of the jury and [distract] them from a fair and unim-passioned consideration of the evidence.” We have consistently upheld the admission of allegedly gruesome photographs where they were independently relevant or corroborative of other evidence.
Id. at 928 (citations omitted).
Hertz v. State, 803 So.2d 629, 641 (Fla.2001). Further, this Court has consistently held that the initial test for determining the admissibility of photographic evidence is relevance, not necessity. See Mansfield, 758 So.2d at 648.

*167
Photograph Taken at the Scene of the Crime (State’s Exhibit 2⅛)

Armstrong argues that the trial court erred by admitting into evidence a particularly gruesome photograph that was taken of Greeney at the scene of the crime because it was prejudicial beyond any value as relevant evidence.
This Court has explained that the trial court does not abuse its discretion in admitting allegedly inflammatory photographs of the victim taken at the scene of the crime when the photographs are relevant to assist the crime scene technician in explaining the condition of the crime scene when police arrived, to show the position and location of the body when it was found, or to show the manner in which the victim was killed. Id. at 641-42.
In the instant case, State’s Exhibit 24 is a photograph that was taken of Greeney’s body at the scene of the crime. In response to defense counsel’s objection, the State alleged that the “photograph was introduced at trial and shows the way that Deputy Greeney was. When he was found on his back and gun in his holster.” The State presented the testimony of Detective Charles F. Edel who testified that the picture accurately portrayed Greeney’s body at the scene of the crime and that Greeney’s holster was unsnapped but the gun was not removed from the holster. Further, Detective Edel testified that the Greeney’s gun had not been fired and was fully loaded. This photograph was relevant to show the position of Greeney’s body at the scene of the crime, the location of the crime, Greeney’s manner of death, and his identity as a police officer in support of the third aggravating factor that the victim in this capital felony case was a law enforcement officer engaged in the performance of his duties. The photograph was probative because it tended to prove that Armstrong shot Greeney and to rebut Armstrong’s theory of the case. Therefore, we conclude that the trial court did not abuse its discretion in admitting State’s Exhibit 24.

Enlarged, Photograph Taken at the Scene (State’s Exhibit 92)

Armstrong contends that the trial court abused its discretion in admitting State’s Exhibit 92, an enlarged photograph taken at the scene of the crime that depicted the side of Greeney’s face and showed a graze wound and soot in Greeney’s left ear. Through Dr. Raul Villa’s testimony, the State introduced State’s Exhibit 92. Defense counsel objected to the introduction of the photograph and informed the trial court that the defense stipulated to the fact that soot was in Greeney’s ear. However, the trial court admitted the photograph.
Armstrong cites to Dyken v. State, 89 So.2d 866, 867 (Fla.1956), to support his argument that photographic evidence cannot be admitted if defense counsel stipulates to the content of the picture. This argument is misguided. There, this Court did not hold that photographic evidence is never admissible if some of the photographic content is stipulated to. Rather, because the only basis for its relevance had already been stipulated to, this Court concluded that it was not independently relevant. Id. at 866.
In the instant case, the photograph displayed not only the presence of soot, which corroborated Dr. Villa’s testimony that Greeney was shot from within 12 to 36 inches and tended to prove that Greeney was shot from approximately 18 inches away, but also displayed scrapes on Gree-ney’s face that demonstrated his manner of death, and the graze wound to Gree-ney’s ear, demonstrating the location of one of his wounds. Thus, the instant case is distinguishable from Dyken because the *168 photograph in the instant case is independently relevant. Moreover, although defense counsel stipulated to the presence of soot, trial courts have broad discretion in admitting photographic evidence and the test for the admission of such evidence is not whether the evidence is necessary. Rather, the evidence is subject to the balancing test: whether the evidence is relevant and, if so, whether the probative value outweighs the danger of prejudice. Thus, the trial court did not abuse its discretion in admitting State’s Exhibit 92.

Autopsy Photograph (State’s Exhibit 23)

Next Armstrong alleges that the trial court abused its discretion in admitting State’s Exhibit 23, an autopsy photograph. Autopsy photographs that are relevant to show the manner of death, location of wounds, and the identity of the victim or to assist the medical examiner in explaining the victim’s injuries are generally admissible evidence. See Ault v. State, 53 So.3d 175 (Fla.2010) (concluding that the trial court did not abuse its discretion in admitting four relevant autopsy photographs that were not unduly prejudicial during Ault’s new penalty phase trial on resentencing) petition for cert. filed, No. 10-11173 (U.S. June 20, 2011). This Court has explained:
Photographs are admissible if “they assist the medical examiner in explaining to the jury the nature and manner in which the wounds were inflicted.” Bush v. State, 461 So.2d 936, 939 (Fla.1985). Moreover, photographs are admissible “to show the manner of death, location of wounds, and the identity of the victim.” Larkins v. State, 655 So.2d 95, 98 (Fla.1995). On the other hand, trial courts must be cautious in not permitting unduly prejudicial or particularly inflammatory photographs before the jury. However, a trial court’s decision to admit photographic evidence will not be disturbed absent an abuse of discretion. See Mansfield, 758 So.2d at 648.
Ault, 53 So.3d at 198-99 (quoting Brooks v. State, 787 So.2d 765, 781 (Fla.2001)). “[T]he mere fact that photographs may be gruesome does not mean they are inadmissible.” Ault, 53 So.3d at 199 (quoting Harris v. State, 843 So.2d 856, 864 (Fla.2003)). To be relevant, however, “a photo of a deceased victim must be probative of an issue that is in dispute.” Almeida v. State, 748 So.2d 922, 929 (Fla.1999).
In this case, the autopsy photograph was first offered into evidence during Detective Edel’s testimony. This photograph was labeled State’s Exhibit 23. This photograph depicts Greeney’s face, neck, and the top of his torso. There are small dots, known as stippling, covering Greeney’s neck and left shoulder and there is a bullet hole in his neck as well as in his left shoulder. Detective Edel testified that he is trained to recognize stippling and has seen evidence of stippling some 200 to 300 times. Detective Edel testified that the stippling around Greeney’s neck caused by burning gunpowder coming into contact with Greeney’s skin. The State then questioned Detective Edel about a photograph of the victim taken at the autopsy, asking, “Does this truly reflect Deputy Greeney at the autopsy?”
Later on, Dr. Villa testified that Gree-ney sustained one gunshot wound to his anterior neck and one underneath his left shoulder. His testimony revealed that the wound to Greeney’s neck was fatal and Greeney would not have lived for more than a few minutes after receiving the wound because it hit the carotid artery and spinal cord. The State introduced the autopsy photograph because it was relevant to Greeney’s manner of death and Armstrong’s involvement in Greeney’s death. The autopsy photograph was probative of *169 Armstrong’s involvement in Greeney’s murder. According to Dr. Villa, Greeney suffered a grazing gunshot wound to his ear and two penetrating gunshot wounds shot from close range. Based on the stippling around his wounds and the searing or burning that his shirt sustained, the State was able to establish that Greeney was shot from close range. Dr. Villa estimated the shots were fired from 18 inches away from Greeney who could have survived only a few minutes after being hit.
The ballistics from the scene revealed that bullets fired from inside the restaurant were from a revolver. Ballistics also revealed that Greeney did not fire his weapon and Sallustio fired 19 shots. The remaining rounds were from a .9 millimeter weapon similar to the one Armstrong possessed. All of the projectiles recovered from Greeney and Sallustio were fired from a .9 millimeter Intertech, Tech-nine firearm. These projectiles were consistent with the firearm that Armstrong purchased in January 1990. This evidence established that Armstrong was the one who shot Greeney and Sallustio and rebutted Armstrong’s claim that he did not shoot the officers and that his participation was minor or a result of duress.
Armstrong’s reliance on Reddish v. State, 167 So.2d 858 (Fla.1964), is misplaced because, in Reddish, the photographic evidence was found to be irrelevant. Id. at 863. In contrast, the autopsy photograph that was introduced during Armstrong’s new penalty phase trial, which was conducted in front of new jurors who did not sit for the guilt phase trial, was relevant to Greeney’s manner of death and was probative of who killed Greeney and shot Sallustio — a fact in dispute as a result of Armstrong’s claim that he did not shoot the officers and that his involvement was minor or a result of duress. Thus, the trial court did not abuse its discretion in admitting the autopsy photograph of Gree-ney.
Furthermore, Armstrong’s contention that the photographs were admissible the photographs were not admissible because the State did not seek the HAC aggravator is misguided. While a photograph may be relevant to prove HAC, see Mansfield, 758 So.2d at 648 (concluding that the admission of photographs of the victim’s mutilated genitalia to support HAC and a sexual battery aggravator was not an abuse of discretion), HAC is not a prerequisite for the admissibility of a photograph. “This Court has upheld the admission of photographs when they are offered to explain a medical examiner’s testimony, the manner of death, the location of the wounds, or to demonstrate the heinous, atrocious, or cruel (HAC) factor.” McWatters v. State, 36 So.3d 613, 637 (Fla.), cert. denied, — U.S. -, 131 S.Ct. 510, 178 L.Ed.2d 378 (2010). Here, each photograph was admissible despite the absence of the HAC aggravator. Thus, this argument is without merit.

Vial of Blood (State’s Exhibit 22)

Finally, Armstrong contends that the trial court erred in admitting a vial of Deputy Greeney’s blood into evidence during the second penalty phase trial. During the 1991 guilt phase trial, a vial of Gree-ney’s blood was proffered through Dr. Villa’s testimony, who removed the blood from Greeney’s heart during the autopsy, and offered and received without defense objection through Detective Edel’s testimony. Dr. Villa testified that the blood was used for toxicology testing and also given to the crime scene laboratory for analysis.
During Armstrong’s second penalty phase trial, the State introduced the same vial. Armstrong claims the vial of blood *170 had no evidentiary value and was had no purpose or effect other than to inflame the minds of the jurors. However, the vial of blood was relevant because it was used for DNA testing and to show that Greeney’s blood was found inside of Armstrong’s vehicle. Moreover, the State contends that the vial of blood was probative because it demonstrated that some of the blood found inside of Armstrong’s vehicle matched, and was in fact, Greeney’s blood. When coupled with the testimony that Armstrong was outside and Coleman was inside of the Church’s Chicken, and the presence of Armstrong’s blood spatter in the car as well, this negated Armstrong’s claim that he did not shoot Greeney. We therefore conclude that the trial court did not abuse its discretion in admitting the vial of Gree-ney’s blood.

Presentation of Cumulative Evidence

Defense counsel objected to the admission of State’s Exhibit 92 as cumulative. As the State noted, State’s Exhibit 92 was the only photograph depicting soot in Greeney’s ear. Once defense counsel objected, the State offered, “If Mr. Rowe has another picture indicating the soot on his left ear, I will be happy to use that, but this is the only picture we have.” While the State introduced 130 photographs, only three were of Greeney’s dead body. The relevance and probative value of the three photographs do overlap to some extent. However, State’s Exhibit 23 was the only photograph that showed Greeney’s body as it was at the scene and also showed Gree-ney in his police uniform. State’s Exhibit 24 was the only photograph that clearly showed the stippling and the bullet wounds to Greeney’s neck and shoulder area. Meanwhile, State’s Exhibit 92 was the only photograph that depicted the soot in his ear. Further, the vial of blood was taken from Greeney’s heart and used to match his blood to the blood inside Armstrong’s vehicle. Thus, the admission of the photographs and vial of blood did not amount to a needless presentation of cumulative evidence.
Moreover, to the extent Armstrong alleges that State’s Exhibit 92 was cumulative because defense counsel stipulated to the presence of soot in Greeney’s ear, this claim is without merit. See Zamora v. State, 361 So.2d 776, 783 (Fla. 3d DCA 1978) (concluding that, notwithstanding defendant’s offer to stipulate to murder, position of body, etc., photographs of victim were relevant in that they corroborated testimony of certain witnesses, as to the cause of death, location and characteristics of wound, and position of body in reference to physical makeup of room; furthermore, photographs were not inflammatory to point of prejudicing minds of jury and, thus, were properly admitted).

Harmless Error

Even if the trial court abused its discretion in admitting any of the aforementioned evidence, the error is harmless. “Where the trial court has abused its discretion in admitting photographs, this Court uses a harmless error analysis.” Philmore v. State, 820 So.2d 919, 931 (Fla.2002) (citing Almeida, 748 So.2d at 930). If there is a reasonable probability that the error affected the verdict, then such error is harmful. McDuffie v. State, 970 So.2d 312, 328 (Fla.2007) (citing State v. DiGuilio, 491 So.2d 1129, 1138 (Fla.1986)). “It is well-established that the harmless error test ‘is not a sufflciency-of-the-evi-dence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test’ but the ‘focus is on the effect of the error on the trier-of-fact.’ ” McDuffie, 970 So.2d at 328 (quoting DiGuilio, 491 So.2d at 1139). A harmless error analysis “re *171 quires an examination of the entire record.” DiGuilio, 491 So.2d at 1135.
Here, even if the allegedly improper evidence had not been admitted, the jury would have reached the same result. Armstrong had already been convicted of the crime and the evidence during his second penalty phase trial supported the three aggravating factors that were imposed. The photographs and vial of blood supported the aggravating factor that the victim in this capital case was a law enforcement officer engaged in the performance of his duties. However, Sallustio’s testimony also supported that aggravator. Additionally, without this evidence, there was still evidence to independently support both of the underlying felonies that were used in support of the prior violent felony aggravator and there was independent evidence to support the robbery aggravator. Thus, the error complained of did not contribute to the verdict. Accordingly, we conclude that the trial court did not abuse its discretion in admitting the photographic evidence and the vial of blood.
B. Bullet Fragment
Second, Armstrong contends that the trial court abused its discretion in admitting a bullet fragment into evidence during his new penalty phase. The admissibility of evidence is within the sound discretion of the trial court, and the trial court’s ruling will not be reversed unless there has been a clear abuse of that discretion. Ray v. State, 755 So.2d 604, 610 (Fla.2000); Zack v. State, 753 So.2d 9, 25 (Fla.2000). “It is within the sound discretion of the trial court during resentencing proceedings to allow the jury to hear probative evidence that will aid it in understanding the facts of the case so that it may render an appropriate advisory sentence.” Bonifay v. State, 680 So.2d 413, 419 (Fla.1996) (citing Teffeteller v. State, 495 So.2d 744 (Fla.1986)).

Probable Tampering

Armstrong argues that he met his burden of demonstrating that there was probable tampering, and thus, the trial court should have excluded the remaining bullet fragment. “Relevant physical evidence is admissible unless there is an indication of probable tampering.” Peek v. State, 395 So.2d 492, 495 (Fla.1980). This is a test for determining whether the chain of custody is established. In order to demonstrate probable tampering, the party attempting to bar the evidence must show that there was a probability that the evidence was tampered with — the mere possibility is insufficient. Murray v. State (Murray I), 838 So.2d 1073, 1082-83 (Fla.2002). Once the party moving to bar the evidence has met its burden, the burden shifts to the nonmoving party to establish a proper chain of custody or submit other evidence that tampering did not occur. Id.
In the instant case, Armstrong cites to Murray I, 838 So.2d at 1082-83 (concluding that the trial court abused its discretion in admitting the evidence because Murray met his burden of demonstrating probable evidence tampering and the State failed to meet its burden of proving that such tampering did not occur) and Dodd v. State, 537 So.2d 626, 627 (Fla. 3d DCA 1988) (concluding that the State failed to establish a sufficient chain of custody to meet its burden of proving that tampering did not occur). Nevertheless, a sufficient showing of the chain of custody is made where the object has been kept in proper custody since the time it was under possession and control until the time it is produced at trial. See Murray v. State (Murray II), 3 So.3d 1108 (Fla.2009) (concluding that there was no break in the chain of custody where lotion was missing from an evidence bag, but was later found to have been intentionally removed from *172 the bag by a print expert so it would not contaminate other evidence).
Based on Murray I and Dodd, Armstrong correctly asserts that he met his burden of demonstrating that probable tampering occurred. Dr. Vincent Karag and Detective John Auer testified that there were two or three projectile fragments initially. When asked about the missing fragment or fragments, neither Dr. Karag nor Detective Auer was able to provide an explanation for their disappearance. The absence of the projectile fragments is certainly suspect and indicative of tampering. However, this claim is without merit because, unlike in Murray I and Dodd, the State met its burden of establishing a proper chain of custody or submitting other evidence that tampering did not occur.
During Armstrong’s new penalty phase, the State introduced the testimony of Dave Tomkins, the Custodial Supervisor for the Broward County Clerk of Courts since 1998. Tomkins testified that procedurally, evidence is marked, tagged, given a storage location and then either stored in his office or in a warehouse. Tomkins testified that if someone wants to view evidence, he or she must make an appointment and sign a review form. Tomkins himself oversees this process and is in the room when the evidence is reviewed. Tomkins testified that he sent the envelope of projectile fragments up for review on or about January 25, 2007. Outside of that instance, the envelope remained stored in the warehouse since the commencement of Armstrong’s trial 17 years ago. Additionally, the State argued that the fragments were each the size of a dot, wrapped in tissue paper, and stored in an envelope. The State contended that it was likely the missing fragment simply fell out of the envelope at some point. Moreover, the State reminded the trial court that the fragments were properly admitted during the Armstrong’s guilt phase trial and that they were part of the record. The State explained that, because Armstrong had already been convicted and the fragments were inculpatory rather than exculpatory, there was no chain of custody problem or risk of prejudice in admitting the fragment. The trial court accepted the State’s argument and noted, “With reference to item Z5, the Court finds that this particular piece has been in the custody of the County Clerk’s Office since 1991.”
Accordingly, we conclude that the trial court did not abuse its discretion in finding that the State established a chain of custody and provided a reasonable explanation to rebut Armstrong’s contention that there was a probability of evidence tampering.

Lost or Destroyed Evidence

Once the trial court found that the evidence had not been tampered with, the trial court categorized the missing fragment as lost or destroyed evidence and found that the remaining fragment was admissible under Arizona v. Youngblood,, 488 U.S. 51, 56, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) (“[U]nless a criminal defendant can show bad faith by the police on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.”). Youngblood explained that the “presence or absence of bad faith for purposes of the Due Process Clause must necessarily turn on the police’s knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.” 488 U.S. at 56 n. *, 109 S.Ct. 333; see also Guzman v. State, 868 So.2d 498, 509 (Fla.2003).
In the instant case, the trial court found that the failure to preserve the missing fragment was not indicative of bad faith. This Court has previously recognized, “[B]ad faith exists only when law enforcement officers intentionally destroy evi *173 dence they believe would exonerate a defendant.” Id. Here, Armstrong has not shown that the projectile exonerated him or that the State ever believed it might. The testimony presented below does not indicate that the prosecutors or police in this case believed the bullet fragments were exculpatory or had any tendency to exonerate Armstrong. Nor does the record reveal that the fragments were destroyed. It does not logically follow that anyone who sought to destroy the evidence would remove one tiny fragment, but leave the larger fragment intact. Therefore, any claim of bad faith destruction or loss of the evidence fails.
Furthermore, as the State repeatedly explained throughout its brief, Armstrong’s offered mitigation involved claims that he was not the shooter and that if Armstrong had any involvement it was minor and under duress. Given that the instant jury had not heard the original guilt phase presentation, but was there merely for resentencing, it was necessary for the State to show the circumstances surrounding the crime and facts that established Armstrong’s guilt to prove aggravation. Likewise, the State was permitted to rebut the offered mitigation. The bullet fragments supported Armstrong’s guilt and his volitional and intimate involvement in the robbery, the shooting of Sallustio, and the first-degree murder of Greeney. Accordingly, we conclude that the trial court did not abuse its discretion in admitting the remaining projectile fragment during Armstrong’s new penalty phase trial.
C. Jury Question
Third, Armstrong contends that the trial court abused its discretion when it failed to instruct the jury that Armstrong was not guaranteed parole at or after 25 years.
Instructions given by a trial court during jury deliberations are subject to the abuse of discretion standard of review. See Green v. State, 907 So.2d 489, 498 (citing Perriman v. State, 731 So.2d 1243, 1246 (Fla.1999)); Fla. R.Crim. P. 3.410. “Discretion is abused only when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court.” White v. State, 817 So.2d 799, 806 (Fla.2002). However, “the court should not give instructions which are confusing, contradictory, or misleading.” Butler v. State, 493 So.2d 451, 452 (Fla.1986) (citing Finch v. State, 116 Fla. 437, 156 So. 489 (1934)).
In the present case, the trial court considered this Court’s decisions in Downs, 572 So.2d at 900 (concluding that the trial court did not abuse its discretion in only instructing the jury that the defendant would received credit for time served); Gore v. State, 706 So.2d 1328, 1332-33 (Fla.1997) (concluding that the trial court did not abuse its discretion in instructing the jury that the defendant would receive credit for time served and in instructing the jury to rely on their recollection of the evidence when asked when parole would occur on the defendant’s other life sentences); and Green v. State, 907 So.2d 489, 497 (Fla.2005) (concluding that the trial court did not abuse its discretion in instructing the jury that the defendant would be entitled to credit for time served, but that parole at or after twenty-five years was not guaranteed).
As the State correctly contends, this Court’s decision in Green does not require that a jury be instructed on the eligibility of parole. Although the circumstances surrounding the jury question and the trial court’s jury instruction in a case may give rise to an abuse of discretion, we have *174 never held that a trial court is required, or per se abuses its discretion in failing, to instruct a jury that parole is not guaranteed. Notably, the standard jury instruction does not apprise a jury of whether a defendant will be guaranteed parole.
The jury instruction below was not confusing, misleading, or contradictory. Nor was it a misstatement of the law. The record reveals that the jury was repeatedly informed that parole was only a possibility. Moreover, the jury was aware that Armstrong had been convicted of other crimes — the State presented evidence that Armstrong was convicted of the related violent felonies and an armed robbery that occurred on February 4, 1990. Thus, the jury was aware that Armstrong was serving other sentences in addition to the life sentence that serves as the basis for this issue. The trial court provided the jury with an accurate instruction when it limited the jury instruction to the specific jury question that was asked. The jury asked whether Armstrong would be entitled to credit for time served, and the trial court instructed the jury that he would be entitled to credit for time served.
As Armstrong correctly points out, the State’s reliance on Waterhouse v. State, 596 So.2d 1008 (Fla.1992), is misplaced because there, the trial court refused to answer the jury question and instead informed the jury that it would have to depend on the evidence and the instructions. Id. at 1015.
Additionally, the instant ease does not contain the “peculiar facts” that were present in Hitchcock v. State, 678 So.2d 859, 863 (Fla.1996) (concluding that the State’s argument that Hitchcock would be eligible for parole after twenty-five years was misleading and prejudicial due to the close proximity of the expiration of his sentence and his resentencing).
Furthermore, even if the trial court abused its discretion, it would be of no consequence, because any error is harmless. Armstrong had already been convicted of the crime. It cannot be said that this instruction would have caused the jury to arrive at a conclusion they would not have otherwise reached as there is substantial aggravation in the instant case that provides independent support for the jury recommendation. Accordingly, we conclude that the trial court did not abuse its discretion below.
D. Cumulative Error
Fourth, Armstrong contends that the cumulative effect of the alleged errors deprived him of a fundamentally fair trial and undermines confidence in the result of his capital proceedings. We have repeatedly held that where the alleged errors, when viewed individually, are “either proeedurally barred or without merit, the claim of cumulative error also necessarily fails.” Israel v. State, 985 So.2d 510, 520 (Fla.2008) (quoting Parker v. State, 904 So.2d 370, 380 (Fla.2005)). Moreover, during Armstrong’s second penalty phase, ample evidence in support of the aggravating factors and sentence of death was introduced independent of the allegedly erroneous evidence. Because Armstrong has failed to demonstrate that any of his claims amounted to error, we deny his claim of cumulative error.
E. Proportionality
In determining whether death is a proportionate punishment, this Court is required to compare the totality of the circumstances of Armstrong’s case to the circumstances of similar cases in which the Court has affirmed sentences of death. See Simmons v. State, 934 So.2d 1100, 1122 (Fla.2006) (citing Urbin v. State, 714 So.2d 411, 417 (Fla.1998)). This Court conducts a two-pronged inquiry, compar *175 ing the instant case to other cases to “determine [whether] the crime falls within the category of both (1) the most aggravated, and (2) the least mitigated of murders.” Almeida v. State, 748 So.2d 922, 938 (Fla.1999). “This entails ‘a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.’ ” Offord v. State, 959 So.2d 187, 191 (Fla.2007) (quoting Urbin, 714 So.2d at 416).
In the instant case, the jury recommended death by a vote of nine to three. The trial court found three aggravators: (1) prior violent felony based on two underlying felonies; (2) the murder was committed during a robbery; and (3) the victim in this capital case was a law enforcement officer engaged in the performance of his duties. Each aggravating factor was accorded great weight. The trial court found one statutory mitigator: (1) the existence of any other factors in the defendant’s background that would mitigate against the imposition of the death penalty. Finally, the trial court found the existence of one nonstatutory mitigator: (1) Armstrong had problems growing up because he was biracial (little weight). After weighing the aggravation and mitigation, the trial court stated “that the aggravating circumstances in this case far outweigh the mitigating circumstances. The aggravating circumstances in this case are overwhelming.” Then, the trial court sentenced Armstrong to death.
We have previously affirmed the death penalty in a single-aggravator case where the single aggravator was a prior violent felony. See Bevel v. State, 983 So.2d 505, 524 (Fla.2008) (citing Ferrell v. State, 680 So.2d 390 (Fla.1996)); see also Lindsey v. State, 636 So.2d 1327, 1329 (Fla.1994). We have repeatedly explained that the prior violent felony conviction aggravator is one of the “most weighty” in Florida’s sentencing scheme. Sireci v. Moore, 825 So.2d 882, 887 (Fla.2002). Given the presence of this aggravator, which is based on the contemporaneous attempted murder of Sallustio and on an armed robbery that Armstrong committed 13 days prior to the murder of Greeney, and the scant mitigation present in this case, it appears that Armstrong’s death sentence remains proportionate. Moreover, we have upheld the imposition of the death penalty as proportionate where there was similar aggravation and more mitigation. See Wheeler v. State, 4 So.3d 599, 603 (Fla.2009) (concluding that the death sentence was proportionate where there were four aggravators, two statutory mitigators, and eleven non-statutory mitigators). Accordingly, we conclude that when compared with other capital cases, the death sentence in Armstrong’s case is proportionate.
It is so ordered.
LEWIS, QUINCE, POLSTON, and PERRY, JJ., concur.
CANADY, C.J., concurs in result.
PARIENTE, J., concurs in part and dissents in part with an opinion, in which LABARGA, J., concurs.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

N.1] Coleman was tried and convicted separately and received a sentence of life imprisonment.

. Huff v. State, 622 So.2d 982, 983 (Fla.1993).

. Nelson v. State, 274 So.2d 256 (Fla. 4th DCA 1973).

. Muhammad v. State, 782 So.2d 343 (Fla.2001).

. Boyd v. State, 910 So.2d 167 (Fla.2005).

. Grim v. State, 841 So.2d 455 (Fla.2003).

. Below, the trial court specifically instructed the jury on improper doubling. The jury was also instructed on and found the avoid arrest aggravator. In Armstrong’s first direct appeal, we noted that "the only evidence supporting the 'committed to avoid arrest' aggravating circumstance was the fact that the victim was a law enforcement officer.” Id. at 738. Accordingly, the trial court declined to merge the avoid arrest aggravator with the aggravating factor that the victim was a law enforcement officer.