# FIRST DISTRICT COURT OF APPEAL
# STATE OF FLORIDA

_____

No. 1D16-1916
_____

LAVAR MONTE THOMPSON,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

_____

On appeal from the Circuit Court for Union County.
David P. Kreider, Judge.

August 3, 2018

PER CURIAM.

A grand jury indicted Lavar Thompson for first-degree murder, home-invasion robbery, burglary with a firearm, kidnapping, and arson. Thompson was convicted on all counts. Because the State sought the death penalty, the case proceeded to a penalty phase, after which the jury voted to spare Thompson's life. The court sentenced Thompson to life in prison, and Thompson now appeals.

## I.

Bill and Connie Couch lived in Lake Butler. Their property comprised a mobile home, several outbuildings, and a camper trailer Mr. Couch called his "man cave." The Couches' daughter,

Chloe, and Mrs. Couch's son from a previous relationship lived with them on the property.

In January 2012, Ronald Griffis knocked on the Couches' front door, offering to pave their driveway. After some negotiating, Griffis and Mr. Couch agreed on a deal, and Griffis said he would come back with a work crew to begin the job.

The next day, Griffis arrived with his girlfriend and two other workers: Amanda Jeffery (Griffis's sister) and Michael Pierce, known to the work crew by his street name, "Rat." The crew worked on the driveway for the next two days. When they finished, the crew asked Mrs. Couch for payment. Mrs. Couch, who was home alone with Chloe, told them Mr. Couch would pay them after he returned and inspected the job. Dissatisfied with this response, Rat became agitated and started pacing back and forth on the Couches' porch saying he'd get his money "one way or another." Mrs. Couch eventually called law enforcement, and officers told the work crew that if they wanted to wait for Mr. Couch, they had to do so off the Couches' property. Meanwhile, Jeffery decided to drive Rat back to his apartment in Starke while the rest of the crew waited on the side of the road near the Couches' home.

On the drive to Starke, Jeffery and Rat discussed burglarizing the Couches' property to get the money they felt they were owed. Rat said he knew someone who could help them do it. Arriving at his apartment complex, Rat saw Appellant Lavar Thompson walking nearby and told him to expect a call later that night. Around 2:30 in the morning, Rat called Jeffery, telling her to come pick him and Thompson up in Starke. Jeffery did as she was told.

A few hours later, Mrs. Couch woke up to find a masked man holding a gun in her face. The man told her "this is a robbery" and said he was going to rape her. With her daughter sleeping nearby, Mrs. Couch begged the man not to. The man then said he would not rape her, but he forced her out of the mobile home, across the yard, and into the Couches' camper.

As Mrs. Couch entered the camper, she saw Mr. Couch covered in blood. His teeth were on the floor. Another masked man—significantly taller than the first and wearing a tan jacket— was standing next to Mr. Couch. The taller man took Mrs. Couch

2

into the camper's bedroom and demanded combinations to nearby safes. When Mrs. Couch explained she didn't know the combinations, both men started beating Mr. Couch with a wrench and stabbing him with an ice pick.

The taller man sat Mrs. Couch down on the couch next to her husband and started binding her with duct tape. When Mrs. Couch resisted, the man struck her on the forehead with a gun. The men then asked Mrs. Couch where they kept their gasoline. She said she didn't know. Eventually, one of the men left the camper and returned with lighter fluid, spraying it throughout the camper and on Mr. Couch. Mrs. Couch asked if they were going to burn her and Mr. Couch alive. They said "no," then cut the duct tape off Mrs. Couch and took her back to the mobile home, leaving Mr. Couch in the camper.

Back in the mobile home, Mrs. Couch sat quietly while the men gathered televisions, game consoles, and other electronics, putting them in Mrs. Couch's SUV. The shorter man also took Mrs. Couch's wedding band off her finger. Around this time, when the mask slipped off the shorter man's face, Mrs. Couch recognized him as Rat, the man who helped pave her driveway.

After loading Mrs. Couch's SUV with stolen property, Rat and the taller man walked out the Couches' front door. Mrs. Couch ran after them to see if they were actually gone. When she got to the door, she saw the camper in flames. She then found Mr. Couch face down on the camper's steps, close to the flames. Although he was alive then, he died later that day.

A few hundred yards from the Couches' home, Amanda Jeffery sat in a parked car, watching emergency response vehicles speed past her. Union County Sheriff's Office Investigator Jerry Feltner, driving one of those vehicles, recognized Jeffery and stopped to ask her what she was doing. Jeffery told Feltner about the driveway job and said she was waiting on her brother to come back from the Couches' house. Feltner told Jeffery that the Couches had just been burglarized and asked if she knew a man who was working with them. Jeffery told Feltner that a man named "Rat" had worked with them. She said she didn't know Rat's real name but knew he was from Starke. Feltner then called a Starke law

3

enforcement officer, asking about anyone named Rat. The Starke officer later determined Rat was Michael Pierce.

Now knowing Pierce (Rat) was a suspect, the Starke officer drove to Rat's apartment complex, parked across the street, and waited to see if Rat would show up. Before long, a car pulled up with Rat and Thompson inside. They parked, went inside, returned in different clothes, and drove off. The Starke officer pulled them over and took them into custody.

Police began gathering evidence left in the wake of Mr. Couch's murder: One of Rat's cousins found stolen electronics and a bloodstained gun inside a shed near his house. A tan bloodstained jacket turned up in Thompson's apartment. Mrs. Couch's SUV was found, on fire, in a graveyard. Police found a purple bloodstained glove by the road near Mrs. Couch's SUV. Officers submitted all this evidence for DNA testing, which returned matches to Mr. Couch (for all items) and Thompson (for the jacket and glove).

## II.

Nearly four years after the crime, Thompson went to trial for first-degree murder, robbery, arson, and kidnapping. By this time, Pierce (Rat) had already pleaded guilty to murder and received multiple life sentences. Jeffery, who had also pleaded guilty, testified at Thompson's trial that she drove Pierce and Thompson from Starke to the Couches' home in Lake Butler and gave Pierce a gun to use during the crime. She also said that Thompson was complicit in the plan, that he discussed details of the robbery with Pierce before being dropped off.

Along with Jeffery's testimony and the evidence recovered from Pierce's cousin's house, Thompson's home, and Mrs. Couch's stolen SUV, the State sought to enter into evidence a blood-stained wallet and shoes that the State indicated had been taken from Thompson when he was booked into the Bradford County jail.

Thompson objected to the admission of this evidence, arguing that the State could not authenticate the wallet and shoes because it could not produce a witness to testify definitively that he or she removed each item from Thompson. Instead, the first person to

4

acknowledge the receipt of each piece of evidence did not know precisely where the items came from other than from either Pierce or Thompson during booking. Thompson argued that this initial gap in chain of custody meant that the items were inadmissible. Ultimately, the court overruled Thompson's objections and the wallet and shoes were admitted. Those evidentiary rulings are the subject of this appeal.

III.

"Authentication or identification of evidence is required as a condition precedent to its admissibility." § 90.901, Fla. Stat. (2016). A litigant can satisfy this requirement with "evidence sufficient to support a finding that the matter in question is what its proponent claims." *Id.* The threshold for authentication is "relatively low," and it "only requires a prima facie showing that the proffered evidence is authentic." *Mullens v. State*, 197 So. 3d 16, 25 (Fla. 2016). And parties can rely on direct or circumstantial evidence to meet this low threshold, *State v. Love*, 691 So. 2d 620, 621 (Fla. 5th DCA 1997), including evidence about an item's "appearance, content, substance, internal patterns, or other distinctive characteristics in conjunction with the circumstances," *Gosciminski v. State*, 132 So. 3d 678, 700 (Fla. 2013). "Once a prima facie showing of authenticity is made, the evidence comes in, and the ultimate question of authenticity is for the jury." *Id.* (citing Charles W. Ehrhardt, *Florida Evidence* § 901.1, at 1092-93 (2013 ed.)). On appeal, we review a trial court's conclusions about authentication only for an abuse of discretion. *Mullens*, 197 So. 3d at 25.

Here, Thompson argues that the State failed to make a prima facie showing of authenticity because there was no testimony specifying which person initially took custody of the wallet or shoes. But to any extent Thompson's authenticity arguments rely on the State's inability to establish a precise chain of custody, that reliance is misplaced. The only time admissibility turns on the State's ability to demonstrate chain of custody is when the opposing party has demonstrated a probability that the item has been tampered with. *See Armstrong v. State*, 73 So. 3d 155, 171 (Fla. 2011) (holding that once the moving party has demonstrated a probability of tampering, "the burden shifts to the nonmoving

5

party to establish a proper chain of custody or submit other evidence that tampering did not occur"). And Thompson never presented any evidence of tampering. Indeed, Thompson's trial counsel admitted there was no evidence of tampering. Accordingly, the burden never shifted to the State.

To the extent Thompson argues the State did not present sufficient evidence for a prima facie showing of authenticity, we again disagree. The Bradford County Sheriff's Office evidence custodian testified that the wallet contained credit cards in Thompson's name, his Florida Driver's License, and his Social Security card. These contents suggest that the wallet was owned by Thompson. *See Gosciminski*, 132 So. 3d at 700. As for the shoes, Agent Woodrow Beauchamp III testified that he removed the shoes from Thompson during booking but forgot to record that on the evidence receipt. (Another witness testified that a different agent removed the shoes, but that witness acknowledged he might have confused that other agent with Beauchamp.) There was also testimony that the shoes could not have been mixed up with Pierce's shoes because the men were placed in separate cells and Thompson's shoes did not have laces and Pierce's did. This testimony did enough to send the question of authenticity to the jury. *See id*. There was no abuse of discretion. *Mullens*, 197 So. 3d at 25.

Finally, even if the court erred in admitting the wallet and shoes, that error was harmless beyond a reasonable doubt. There was substantial direct evidence of Thompson's guilt: Jeffery testified Thompson agreed to take part in the robbery and that she dropped both of them near the Couches' property the morning of the crime. The jacket recovered from Thompson's apartment was stained in Mr. Couch's blood and Mrs. Couch identified it as the jacket Rat's accomplice wore inside the camper. And Mr. Couch's blood and Thompson's DNA were found on the purple glove near Mrs. Couch's smoldering SUV. Considering the quality and quantity of the other evidence presented at trial, we are convinced that there is no reasonable possibility that any error related to the admission of the wallet and shoes contributed to the verdict. *See State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986).

AFFIRMED.

WOLF, OSTERHAUS, and WINSOR, JJ., concur.

_____

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

_____


Andy Thomas, Public Defender, and Nada M. Carey, Assistant Public Defender, Tallahassee, for Appellant.

Pamela Jo Bondi, Attorney General, and Robert Quentin Humphrey, Assistant Attorney General, Tallahassee, for Appellee.