# Supreme Court of Florida

_____

No. SC2023-1003
_____

**JOSEPH ZIELER,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

April 16, 2026

PER CURIAM.

The appellant, Joseph Zieler, was sentenced to death for the 1990 first-degree murders of R.C. and L.S. in Lee County. Zieler was unknown to investigators of the double homicide until 2016, when his DNA was entered into the Combined DNA Index System (CODIS) and triggered an alert. This is Zieler's direct appeal. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. As we explain, we affirm Zieler's convictions and sentences.

## BACKGROUND

### Events Surrounding the Murders

Jan C. lived in a condominium in Cape Coral with her daughter, 11-year-old R.C., and a friend/colleague, 32-year-old L.S. L.S. had recently moved into a spare bedroom in the condominium to share living expenses. On the evening of May 9, 1990, Jan went to her boyfriend's home to watch a basketball game on television. L.S. and R.C. encouraged her to do so while they remained at home. Both were in their beds when Jan left.

Jan, who had to get up early the next morning for work at a local hospital, had intended to return home after the game concluded. However, she fell asleep and did not wake up until 4 a.m. Jan then rushed home to get ready for work, and upon arrival, discovered that the front door that had been locked only at the deadbolt was also locked at the broken door handle. When the broken door handle was locked, it prevented entry from the outside.

Jan did not immediately sense that there was a problem; instead, she thought that L.S. probably forgot about the broken door handle and mistakenly locked it before going to bed. Jan then walked around the unit to the patio and discovered that the sliding

glass door was open, and the vertical blinds were blowing out the door.

After Jan entered the previously organized unit, she began to notice signs of disarray. She went upstairs and first reached the door of L.S.'s room where she saw L.S.'s nude body on the bed. When she called out to L.S., she did not get a response. Jan raced to the other bedroom and found R.C. face down on the floor at the foot of the bed. R.C.'s legs were spread apart, a vibrator was on the floor between her legs, and a pillow was located underneath her stomach. Jan called 911 as she began to administer CPR to R.C. As Jan performed CPR on R.C., she observed nasal congestion that suggested to her that R.C. had been crying a lot. Jan heard R.C.'s lungs aspirate.

When law enforcement arrived, evidence indicated that an intruder entered the condominium, attacked, sexually battered, and suffocated both victims, and ransacked the unit.

L.S. was found lying in her bed on her right side with a pillow partially covering her head. She sustained extreme injuries to her anal cavity and significant bleeding. There were scratches on her body, and a broken fingernail on her hand appeared to be a

defensive wound.  An open pornographic magazine was found on her bed.  Injuries to the mucosa of her lips and the presence of a pillow suggested that she may have been smothered to death.

The search of L.S.'s room revealed an empty wallet with items missing, and an empty watch box that previously contained a watch that L.S. recently bought as a present.  The watch was never located.

R.C. had bruising and scrapes on her cheekbones and her lips were purple, which indicated that she had been suffocated.  There was significant bleeding from her vaginal area.  She had a cut in the middle of her back, possibly caused by being dragged across sharp wood at the foot of the bed.  R.C. also had an abrasion on her left thigh which was likely caused when her underwear was ripped off. A pair of ripped underwear was found in the room.  R.C.'s wounds indicated that there was a struggle before her death.

## The Autopsies

Medical examiner testimony indicated that both victims died as a result of asphyxiation.  The bodies of both victims showed signs of a struggle and signs of sexual battery.  L.S. suffered extreme anal injuries and bleeding, consistent with an object

- 4 -

penetrating her anus. R.C. suffered injuries to her vagina that caused significant bleeding and were the result of penetration by an object. The penetration of L.S. and R.C. occurred contemporaneously with their deaths, but the medical examiner was unable to determine with certainty whether penetration occurred before or after their deaths. However, the initial lead detective testified that in his experience, based on the amount of bleeding from the anal cavity of L.S. and the vaginal area of R.C., they were likely both alive when they were penetrated.

Various items of evidence including genital swabbings and hair evidence were obtained from the victims' bodies.

### DNA Evidence

During the investigation, DNA testing excluded many persons of interest. Evidence submitted for DNA testing in 1990 revealed the presence of sperm cells in the genital gauze swabbing, vaginal slides, and anal slides obtained from R.C., the genital gauze swabbing obtained from L.S., and a pillowcase and bedsheet that were found in the bedroom with R.C.

The bedsheet, the pillowcase, and the genital swabbing from R.C. all tested positive for semen in a sufficient quantity to develop

a DNA profile. These items were first tested using RFLP testing in 1990, then they were sent for additional testing in 2000 and again in 2012 due to advancements in DNA technology.

RFLP DNA testing performed on the pillowcase and on the genital swabbing from R.C. yielded DNA profiles that were consistent with one another. The sample size from the genital swab indicated that the semen was deposited onto R.C. as opposed to being transferred onto her. At the time, the results of these tests were not entered into CODIS, which only accepts STR DNA test results. The genital swabbing obtained from L.S. and the anal swabs obtained from R.C. were insufficient for further testing.

STR DNA testing was conducted in 2000. The genital swabbing obtained from R.C. and the pillowcase retrieved from R.C.'s bedroom yielded partial DNA profiles, and a cutting from the bedsheet yielded a complete DNA profile. The three DNA profiles were consistent with one another. The profile from the bedsheet was entered into CODIS.

In 2008, STR DNA testing was conducted on hairs obtained from L.S.'s body. Among several hairs and debris or fibers, the analyst found four hairs suitable for DNA testing. Two of the hairs

were very light in color and yielded no DNA.  The other two hairs were darker in color and yielded partial DNA profiles that were consistent with one another.  Each of the four hairs was less than 15 millimeters long and, due to the small size, completely consumed during the DNA testing.

In 2012, in response to further advancements in DNA analysis, the bedsheet was resubmitted for STR DNA testing.  The results revealed a complete DNA profile that was consistent with the profile obtained in 2000.  The profile was entered into CODIS.

In 2016, law enforcement received a CODIS hit, or lead, in the L.S. and R.C. double homicide case.  Zieler's DNA, obtained as a DNA sample in an unrelated case, was determined to be a match to DNA obtained from the bodies of L.S. and R.C. and the crime scene.

DNA analysts testified that when comparing the DNA obtained from R.C.'s bedsheet to Zieler's DNA profile, one would expect to see that profile in one in 83 quintillion people.  As to the comparison between the DNA obtained from R.C.'s pillowcase and Zieler's DNA profile, one would expect to see that profile in one in 450 million people.  The statistics were one in 16 million with respect to the hair obtained from the body of L.S., and one in 360,000 with

respect to the genital swabbing from R.C.

**Zieler Identified as a Suspect and Interviewed by Detectives**

Once Zieler was identified as a suspect in the murders, detectives conducted an interview during which he was described as "nervous" and "evasive." Zieler stated that he could not make decisions for himself and that he could not remember anything due to a head injury he sustained in an accident. When shown photographs of L.S. and R.C., Zieler denied having seen either of them before.

After Zieler's interview concluded and an officer offered to get him a soda, Zieler said, "It'll probably be the last one I ever get." Before the interview, no one had mentioned to Zieler that he was a suspect in the murders, and Zieler had only been identified as a suspect via the CODIS hit the day before.

In contrast to the memory challenges Zieler asserted during the September 2016 interview, a detective testified at trial that following Zieler's arrest on an unrelated charge in August 2016, Zieler demonstrated good memory and gave very detailed responses to all questions. During that interview, Zieler discussed how he was raised by his parents, and he specifically recalled an event that

occurred in 1991. He explained that he had been in a relationship with his girlfriend Bonnie for 25 years and that he had previously worked in a boatyard until he suffered an injury.

Similar to the testimony from the detective, the trial testimony of Zieler's long-time partner, Bonnie, also contradicted Zieler's purported significant memory loss. She also stated that over the years, Zieler vaguely referred to his past and described himself without explanation as "dirty." Additionally, she recalled that when having intercourse with Zieler, he preferred to place a pillow underneath her pelvis.

### Charges Filed

In addition to the indictments for first-degree murder, Zieler was initially charged with sexual battery on a child under 12 years of age, sexual battery with a deadly weapon or great force, and first-degree burglary. The sexual battery and burglary counts were dismissed in 2022. However, evidence of sexual battery as to both victims and of the burglary was introduced during the guilt phase and relied on by the State during the penalty phase as proof of aggravating factors.

**Zieler's First Jury Selection
and the Subsequent Amendment to the
Statute Requiring Jury Unanimity in Sentencing**

Zieler's first jury selection lasted from February 27 to March 2, 2023, and it ended with the prospective jurors being dismissed because they were given an incorrect statement of the law as it stood at the time of the murders in 1990. The jurors were incorrectly told that if convicted, Zieler would be subject to a minimum sentence of life imprisonment without the possibility of parole instead of life imprisonment with the possibility of parole after 25 years.

Before Zieler's trial began anew in May 2023, the Legislature amended the statute governing capital sentencing in Florida, set forth in section 921.141, Florida Statutes. The amendment changed the then-existing requirement of jury unanimity in capital sentencing to allow a judge to impose a sentence of death upon the recommendation of eight or more jurors. *See* ch. 2023-23, § 1, Laws of Fla. (amending § 921.141(2)(c), Fla. Stat.); § 921.141(2)(c), Fla. Stat. (2023).

**Guilt Phase**

Zieler's new jury selection took place May 8-11, 2023, followed

by the guilt phase May 15-18, 2023. At the conclusion of the State's case-in-chief, Zieler was the only defense witness. He maintained his innocence and asserted that he was in Maryland at the time of the murders. Before trial, he sent letters to the state attorney's office stating that he was in jail at the time of the murders. However, the prosecutor confronted Zieler with evidence that the state of Maryland certified that there was no record of Zieler ever being arrested there.

Zieler also claimed that his DNA could only have been in the condominium where the murders occurred if, in 1989, he had sex with R.C.'s mother or her friend Leeann. Zieler also admitted to sending letters to R.C.'s family, in which he made the same allegation. The State called R.C.'s mother in rebuttal, who denied ever meeting or having any contact with Zieler.

The jury convicted Zieler of the first-degree murders of R.C. and L.S.

### Penalty Phase

The State and the defense presented testimony and other evidence during the penalty phase. The State sought to prove four aggravating factors: (1) Zieler was previously convicted of a felony

involving the use or threat of violence to the person; (2) the capital felony was committed while the defendant was engaged in the commission of a burglary; (3) the capital felony was especially heinous, atrocious, or cruel (HAC); and (4) the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP).

To prove the prior violent felony aggravating factor, the State relied on evidence of the contemporaneous murders of R.C. and L.S., as well as a stipulation that Zieler was previously convicted of resisting an officer with violence and felony battery. To set forth a factual basis for the resisting with violence conviction, the State also presented a portion of the offense report detailing the officer/victim's statement.

To prove the aggravating factor that the capital felony was committed while Zieler was engaged in the commission of a burglary, the State relied on evidence of the condition of the condominium as observed by investigators and Jan, including descriptions of missing property.

To prove the CCP aggravating factor, the State referred to the testimony of the medical examiner who testified that deaths

through asphyxia by suffocation take three to five minutes to occur, before which there is a 60- to 70-second period of loss of consciousness.

To prove the HAC aggravating factor, the State referred to the testimony of the medical examiner who testified that the cause of death for one victim was asphyxia by suffocation and that the cause of death for the other victim was asphyxia suggestive of suffocation. The State discussed the various physical injuries suffered and the evidence that both victims struggled and resisted being attacked.

The State also presented victim impact evidence on behalf of L.S. and R.C.

The defense presented the testimony of a forensic psychologist and a neurologist. Dr. Julie Harper, a clinical and professional psychologist who works as a forensic psychologist, testified based on her review of the records that as a child, Zieler showed symptoms of what is now diagnosed as ADHD.

Additionally, Dr. Harper testified regarding Zieler's recollections of his unstable childhood, which included Zieler being verbally and physically abused, and Zieler witnessing his father physically abuse his mother and brothers. Dr. Harper concluded

- 13 -

that Zieler's unstable home life contributed to his history of low self-esteem and depression. Zieler also indicated to Dr. Harper that he had been sexually abused as a child.

Dr. Harper noted Zieler's recall of a childhood memory where he slipped on the first day of school and injured his head, "which [Zieler] feels impaired his concentration and ability to focus during school." She also testified regarding her review of Zieler's hospital and disability records documenting a vehicle accident-related closed head injury in 1998 and another accident-related head injury in 2014. She opined that the 1998 accident particularly affected Zieler's memory and ability to carry out activities of daily living.

Dr. Harper administered to Zieler an Inventory of Legal Knowledge and testified that there was no evidence that Zieler was malingering. She also administered the Wechsler Adult Intelligence Scale, fourth edition (WAIS-IV), and determined that Zieler has a low average overall I.Q. score.

Zieler's performance on the Kaplan Baycrest Neurocognitive Assessment, also administered by Dr. Harper, demonstrated adequate ability in attention and concentration and average immediate recall. Zieler demonstrated delayed recall and

recognition memory, as well as difficulty with reasoning, conceptual shifting, spatial processing, and the verbal recall aspect of verbal fluency.

Dr. Harper diagnosed Zieler, who was previously diagnosed with adjustment disorder, with major depressive disorder recurrent and mild neurocognitive disorder. She indicated that Zieler has a tremor and that the tremor and Zieler's difficulties in verbal fluency are symptoms consistent with a diagnosis of Parkinson's disease.

Dr. Mark Rubino, a neurologist, testified that Zieler does not have Parkinson's disease, but he has Parkinsonism, which differs from Parkinson's disease in that it does not respond to Parkinson's treatment.

Dr. Rubino also reviewed hospital and disability records regarding Zieler's 1998 and 2014 accidents and noted that after the 1998 accident, Zieler began displaying symptoms typical of those caused by a head injury. Dr. Rubino also testified to Zieler's account of falling and hitting his head at school, stating, "I don't think [Zieler] really remembers [any effects from the fall], other than he said he didn't do very well after that."

Dr. Rubino administered a PET scan and the Montreal Cognitive Assessment. He testified that the PET scan results indicated low metabolic activity in Zieler's brain, and he opined that Zieler's score on the Montreal Cognitive Assessment indicated that Zieler is "very impaired."

Dr. Rubino suggested that Zieler's PET scan results could be indicative of a concussion, a brain injury, or frontotemporal dementia.

During rebuttal, the State presented the testimony of two psychologists. Dr. Karim Yamout testified to administering to Zieler at least 20 cognitive tests. The results of six tests designed to detect malingering did not reveal malingering by Zieler. However, Dr. Yamout evaluated the reliability of Zieler's self-reports via a symptom validity test, which evaluated whether Zieler was reporting in a valid manner. Zieler failed the test, which indicated that Dr. Yamout could not assume at face value the accuracy of anything Zieler claimed related to his mental disorders.

Dr. Yamout concluded that Zieler's memory is not impaired, he does not have dementia, his intellect falls in the low average to average range, and his I.Q. score is in the normal range.

Dr. Yamout diagnosed Zieler with mild neurocognitive impairment, similar to Dr. Harper's diagnosis of minor neurocognitive disorder, but said that this diagnosis would not cause a person to be disabled. Based on the evidence, Dr. Yamout opined that Zieler did not have a traumatic brain injury.

Dr. Keegan Culver, a psychologist, administered to Zieler the Minnesota Multiphasic Personality Inventory. However, the test was invalidated because Zieler "endorsed so many atypical, nonrealistic symptoms that it invalidated the entire protocol." Zieler also admitted to "play[ing] up my head injury when it suits my situation." Zieler denied being actively anxious or depressed but was taking a typical antidepressant at the time.

**Jury Recommendation, *Spencer* Hearing, and Sentencing**

At the conclusion of the two-day penalty phase, the jury recommended by a vote of 10-2 that Zieler be sentenced to death for each murder.

The State and the defense submitted sentencing memoranda but neither presented additional evidence at the *Spencer*[1] hearing.

---

1. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

However, Zieler testified again at the *Spencer* hearing and denied committing the murders.

Upon determining that sufficient aggravating factors existed to impose a sentence of death for each murder and that the aggravating factors outweighed the mitigating circumstances found to exist, the trial court sentenced Zieler to death for the murders of R.C. and L.S. The court found that each of the four aggravating factors argued by the State applied to both murders: (1) Zieler was previously convicted of a felony involving the use or threat of violence to the person (great weight); (2) the capital felony was committed while the defendant was engaged in the commission of a burglary (great weight); (3) HAC (great weight); and (4) CCP (great weight).

The trial court also considered 42 nonstatutory mitigating circumstances, finding the existence of and affording weight to 36 of them.[2] The court rejected three statutory mitigating

_____

2. The trial court considered the following 42 nonstatutory mitigating circumstances and assigned weight as indicated: (1) Zieler's age (61 years) (minimal weight); (2) Zieler suffers from anxiety (minimal weight); (3) Zieler suffers from symptoms of Parkinson's disease, including a neurocognitive disorder, tremors, memory loss, and head jerking (minimal weight); (4) Zieler

sustained a traumatic closed-head injury as a result of a severe motorcycle accident (moderate weight); (5) Zieler sustained a right leg fracture and a "degloving" injury to his foot (established but no weight); (6) Zieler has a neurodegenerative disorder, manifesting in mildly reduced uptake in the bilateral frontal lobes, which raises the possibility of frontotemporal dementia per FDG/PET scan (minimal weight); (7) Zieler suffers from vascular disease (established but no weight); (8) Zieler has a history of traumatic brain injury (minimal weight and duplicative with other nonstatutory mitigating circumstances); (9) Zieler has been diagnosed with cognitive impairment, manifesting as a borderline score on processing speed (minimal weight); (10) Zieler suffered from a heart attack and stent surgery (established but no weight); (11) Zieler has high blood pressure (established but no weight); (12) Zieler was diagnosed with adjustment disorder with a depressed mood (minimal weight); (13) Zieler was diagnosed with an amnestic disorder (minimal weight); (14) Zieler has strengths in testing, with variable performance (minimal weight); (15) Zieler exhibits significant weakness in conceptual shifting (minimal weight); (16) Zieler falls in the low average to average range of intellectual disability (minimal weight); (17) Zieler has experienced episodic depression throughout his life and suffers from a major depressive disorder (not established; no weight); (18) Zieler suffers from adaptive functioning deficits (established but no weight); (19) Zieler had symptoms of inattention during middle school, which resulted in poor grades (established but no weight); (20) Zieler was never referred for remedial services, retained, or tested for services by the school system for academic assistance (partly established but no weight); (21) Zieler had good attendance at school (partly established but no weight); (22) Zieler did not graduate high school and had a 10th grade education (established but no weight); (23) Zieler was exposed to drugs at an early age and was smoking marijuana when he was nine years old (established but no weight); (24) Zieler sustained head trauma as a child when he slipped on ice, which resulted in a scar and a permanent lump on the back of his head (minimal weight); (25) Zieler has witnessed domestic violence between his father and his mother (minimal weight); (26) Zieler was physically and emotionally neglected by his

circumstances.[3]  This direct appeal of Zieler's convictions and

sentences follows.

parents as a child growing up (minimal weight); (27) Zieler was physically and verbally abused by his father (minimal weight); (28) Zieler witnessed the physical and verbal abuse of his brothers by his father (minimal weight); (29) Zieler often sought refuge at the home of his maternal grandmother after school to avoid his father's abuse (minimal weight); (30) Zieler's father relocated the family to an Illinois town that was farther away from his grandmother, preventing Zieler from going to her house and avoiding his abusive home environment (minimal weight); (31) Zieler is uncertain of his paternity and believes his uncle may be his biological father (not established); (32) Zieler never received grief counseling or other services after the loss of his maternal grandmother, mother, and other close relatives (minimal weight); (33) Zieler's father was fired from the Cape Coral Police Department for conduct unbecoming an officer after he admitted to burglarizing a restaurant (not established); (34) Zieler got married when he was 20 years old (not established; no weight); (35) Zieler became a father at 21 years of age when his eldest son was born (established but no weight); (36) Zieler was divorced when he was 23 years old, and Zieler was not allowed to see his son (not established; no weight); (37) Zieler held several jobs prior to his motorcycle accident, including working for a family-owned business, Goodwill Industries, Silco Industries, and Marine Concepts, and working with boats (minimal weight); (38) Zieler attempted to stop an armed gunman and called the police to protect his family (not established; no weight); (39) Zieler has low self-esteem (established but no weight); (40) Zieler told Bonnie not to worry about visitation to take the stress off of her (moderate weight); (41) Zieler cooperated with law enforcement and did not resist them (minimal weight); and (42) Zieler is capable of redemption (not established; no weight).

 3.  The trial court rejected the following statutory mitigating circumstances: (1) the capital felony was committed while Zieler was under the influence of extreme mental or emotional

## ANALYSIS

### I. Fundamental Error

Zieler argues that after the original jury panel was dismissed, defense counsel failed to realize the urgency of resetting a new trial in light of the then-potential change to the statute requiring juries to unanimously recommend the death penalty. He maintains that defense counsel provided ineffective assistance of counsel resulting in fundamental error when his trial was held after the statutory jury unanimity requirement was eliminated. However, we proceed without further discussion, as Zieler's claim is not cognizable in this direct appeal. *See Steiger v. State*, 328 So. 3d 926, 932 (Fla. 2021) (stating that to raise and prevail on any unpreserved claim of error on direct appeal, the defendant must demonstrate fundamental error).

### II. Prosecutorial Comments

Zieler argues that during his second jury selection, the prosecutor made constitutionally impermissible comments to

---

disturbance; (2) Zieler's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and (3) Zieler's age at the time of the crime.

prospective jurors that diminished the jury's responsibility for its verdict. He argues that in doing so, the prosecutor violated the rule set forth in *Caldwell v. Mississippi*, 472 U.S. 320 (1985). We review this question of law de novo. *See Davis v. State*, 136 So. 3d 1169, 1201 (Fla. 2014). Moreover, the fundamental error standard applies because it was incumbent upon defense counsel to object again to comments made during the second jury selection that began anew more than two months after the first panel of jurors was dismissed entirely. We hold that there was no *Caldwell* violation.

Zieler's second jury selection began with instructions from the trial court in which the trial court explained that if the jury found at least one aggravating circumstance, it would be required to make a recommendation on sentencing. The court explained the weighing on which the recommendation must be based and that a vote of eight to four or greater would result in a recommendation of death. The jury's recommendation would be life imprisonment with the possibility of parole after 25 years if fewer than eight jurors determined that Zieler should be sentenced to death.

Zieler cites several but not all of the instances during

individualized questioning where the prosecutor referred to the jury's duty to make a "recommendation." Indeed, the prosecutor consistently questioned similar to the following: "And will you give a fair chance to either the death penalty or the life without possibility of parole for 25 years as the jurors—as your recommendation as a juror and as the jury's recommendation?"; "Do you appreciate that although you might make a death recommendation or you might make a possibility of parole—of life without parole for at least 25 years, the judge is actually the person who sentences the defendant?"; "And you feel comfortable with that recommendation?"

Additionally, Zieler highlights comments made to two prospective jurors that were ultimately seated on his jury: jurors 1221 and 1372. To prospective juror 1221, the prosecutor asked, "And you understand that what you're asked to do between those two options [of either death or life without the possibility of parole for 25 years] is a recommendation to the Court? . . . And that the sentencing is actually done at the discretion of the Court?" To prospective juror 1372, the prosecutor asked, "Do you understand that that's a recommendation and really, the sentence is ultimately determined by the court?"

There is a significant distinction between what the prosecutor said in *Caldwell* and what was said in Zieler's case. In *Caldwell*, the United States Supreme Court reversed a death sentence and remanded the case for further proceedings because the prosecutor's penalty phase closing argument lessened the jurors' sense of their responsibility in determining sentencing by improperly assuring them that their decision was "automatically reviewable" by the state supreme court. *Caldwell*, 472 U.S. at 341.

The comments that Zieler complains of—particularly their mention of a jury's recommendation—are substantively different from those in *Caldwell*. Unlike *Caldwell*, there was no mention of automatic appellate review by this Court that would have lessened jurors' sense of their responsibility with respect to Zieler's sentencing. *See Allen v. State*, 322 So. 3d 589, 597 (Fla. 2021) (concluding that a prosecutor's statement asking the jury to return a "recommendation" of death was not error "because the statement did not 'improperly describe[] the role assigned to the jury by local law'") (alteration in original) (quoting *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994)). Importantly, "[u]nder the plain text of Florida's death penalty statute, a sentencing 'recommendation' is precisely

- 24 -

what the penalty-phase jury provides." *Id.* at 597-98 (citing § 921.141(2), Fla. Stat. (2018)).

Moreover, to properly evaluate *Caldwell* claims, we must "look to the 'total trial scene,' including jury selection, the guilt phase of the trial, and the sentencing hearing, examining both the court's instructions and counsel's arguments to the jury." *Id.* at 600 (quoting *Barrientes v. Johnson*, 221 F.3d 741, 777 (5th Cir. 2000)). Here, the jury was told from the beginning of jury selection that it would be responsible for making a recommendation to the court. During the penalty phase, the jury heard evidence in both aggravation and mitigation, and it was instructed on four aggravating circumstances and 42 nonstatutory mitigating circumstances. Further, Zieler's jury received thorough instructions that explained, consistent with Florida law, its responsibility and the process for determining whether to recommend that Zieler receive life imprisonment with the possibility of parole in 25 years or the death penalty. As we observed in *Allen*:

> [T]he jury was properly informed as to its role in [the defendant's] sentencing, including that if the jury found [the defendant] guilty of first-degree premeditated murder, a separate penalty-phase trial would occur in which the jury's role would be to determine [the

defendant's] eligibility for the death penalty and recommend the appropriate sentence.

*Id.* As in *Allen,* significant jury selection discussion was "devoted to addressing the jury's role should the case proceed to a penalty phase, including the death qualification of the jury, and the trial court properly instructed the jury regarding its role during the penalty phase." *Id.*

Thus, Zieler is not entitled to relief.

### III. Admission of Hair Evidence

Zieler also argues that the absence of evidence in four paper folds contained in State's exhibit 110 is evidence of probable tampering that should have prevented the admission of the hair DNA evidence linking him to L.S.'s murder. Before trial, Zieler filed a motion in limine seeking to exclude hairs and related DNA evidence that linked him to the body of L.S., contending that other hairs had been collected but "were either lost or mishandled by the investigating agency and not subject to DNA testing." The trial court denied the motion, noting that the matter was suitable for cross-examination.

The admissibility of evidence is within the discretion of the

trial court, and this Court reviews the trial court's ruling for an abuse of discretion. *See Armstrong v. State*, 73 So. 3d 155, 171 (Fla. 2011) (citing *Ray v. State*, 755 So. 2d 604, 610 (Fla. 2000); *Zack v. State*, 753 So. 2d 9, 25 (Fla. 2000)).

Additionally, "[r]elevant physical evidence is admissible unless there is an indication of probable tampering." *Peek v. State*, 395 So. 2d 492, 495 (Fla. 1981). The mere possibility of tampering is insufficient to shift the burden to the State to rebut any evidence of tampering. *See Murray v. State*, 838 So. 2d 1073, 1082-83, 1082 n.8 (Fla. 2002). Here, Zieler did not meet his burden of demonstrating probable tampering, and we conclude that the trial court did not abuse its discretion by admitting the hair DNA evidence over Zieler's objection.

Moreover, any potential error is harmless given the other physical evidence in this case. The evidence found at the condominium demonstrated that in a single series of events, L.S. and R.C. were sexually battered and murdered in their bedrooms. Substantial and conclusive DNA evidence linked him to the murder and sexual battery of R.C. Thus, we conclude beyond a reasonable doubt that excluding the challenged evidence would not have

affected Zieler's guilty verdicts. *See State v. DiGuilio*, 491 So. 2d 1129, 1135, 1138-39 (Fla. 1986).

## IV. Sentencing Order

Zieler argues that the trial court made an error in the sentencing order that may have affected the weight accorded to the jury's recommendation that he be sentenced to death. However, the trial court did not err.

In section G, paragraph 43 of its sentencing order, the trial court said the following:

> Defendant submitted no statutory mitigating circumstances under Fla. Stat. 921.141(7). The jury found that no mitigating circumstances had been proven by a greater weight of the evidence. However, the Court has independently considered some statutory mitigating factors that may apply in this case. Moreover, the Court considered the possibility that other factors may exist in the Defendant's character, record, or background that would mitigate against the imposition of the death penalty. Specifically, the Court has considered the following mitigating factors, beginning with the statutory mitigating factors under Fla. Stat. § 921.141(7) that may be applicable.

Zieler claims the trial court's statement that "[t]he jury found that no mitigating circumstances had been proven by a greater weight of the evidence" constitutes reversible error. We conclude that this claim is meritless.

When viewed in context, the court's statement is not ambiguous, let alone erroneous. The statement appears between two sentences where the court specifically discusses *statutory* mitigating circumstances. The jury was not presented with any statutory mitigating circumstances, only the 42 nonstatutory mitigating circumstances, which means that it did not have the opportunity to find the existence of any statutory mitigating circumstances by a greater weight of the evidence. Moreover, a later portion (paragraph 53) of the sentencing order states as follows: "No statutory mitigating factors were raised or established, but the Court considered the non-statutory mitigating factors presented by Defendant. Out of 42 enumerated non-statutory mitigating factors, the Court found that 36 have been established."

Moreover, any error here is harmless because the record is clear that the trial court independently considered 42 nonstatutory mitigating circumstances, found 36 of them, and assigned varying weights. The court also stated that it gave great weight to the jury's recommendation "by a vote of ten to two . . . that the death penalty be imposed." The court ultimately found that death was warranted upon concluding that the aggravating factors it described as

"horrific" "greatly outweigh[ed] the comparatively insignificant mitigating factors."

## V. Constitutionality of Florida's Death Penalty

Zieler also challenges the facial constitutionality of Florida's capital sentencing scheme. In particular, he argues that the current death penalty violates the Eighth Amendment due to Florida's elimination of comparative proportionality review, the elimination of the statutory requirement that a jury unanimously recommend a death sentence, and a lack of a sufficient narrowing of the class of individuals subject to the death penalty. We reject Zieler's argument as these factors, neither individually nor cumulatively, render Florida's capital sentencing scheme unconstitutional.

"We have repeatedly rejected the argument that the death-penalty statute violates the Eighth Amendment because it fails to sufficiently narrow the class of murderers eligible for the death penalty." *Wells v. State*, 364 So. 3d 1005, 1015 (Fla. 2023) (rejecting a claim of insufficient narrowing after the addition of a sixteenth statutory aggravating factor). Moreover, we have concluded that the "abandonment of comparative proportionality

review [in *Lawrence v. State*, 308 So. 3d 544, 548-50 (Fla. 2020)] does not alter our analysis." *Id.*

Nor does the absence of a requirement that a jury unanimously recommend death further Zieler's argument of unconstitutionality. "[N]either the Eighth Amendment nor any provision in our state constitution requires jury sentencing in capital cases, or a unanimous jury recommendation, or indeed any jury recommendation at all." *Herard v. State*, 390 So. 3d 610, 622-23 (Fla. 2024) (citing *State v. Poole*, 297 So. 3d 487, 503-05 (Fla. 2020)).

### VI. Unanimous Jury Recommendation

As a separate matter, Zieler urges this Court to reconsider our conclusion in *Poole*; that is, a jury must unanimously determine that death is the appropriate sentence before the death penalty can be imposed. However, we have conclusively rejected Zieler's argument that the United States Constitution or the Florida Constitution requires that a jury unanimously recommend the death penalty, and we decline to revisit this issue. *See Poole*, 297 So. 3d at 504-05 (rejecting unanimity argument on Sixth and Eighth Amendment grounds and under the Florida Constitution);

*Zack v. State*, 371 So. 3d 335, 350 (Fla. 2023) (stating that "the Supreme Court's Eighth Amendment precedent to which we are bound does not require a unanimous jury recommendation for death during the penalty phase").

As to Zieler's sentences of death involving the contemporaneous first-degree murders of the two victims, where the aggravating factors in this case included the finding that Zieler "was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person,"[4] there is no dispute that his sentences satisfy the constitutional requirements we explained in *Poole*.

## VII. Sufficiency of the Evidence

Although Zieler does not challenge the sufficiency of the evidence supporting his convictions, this Court has an independent obligation to review the record to determine whether there is sufficient evidence to support Zieler's murder convictions. *See Miller v. State*, 379 So. 3d 1109, 1120, 1129 (Fla. 2024). "In determining the sufficiency of the evidence, the question is whether,

---

4. § 921.141(6)(b), Fla. Stat.

- 32 -

after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." *Bradley v. State*, 787 So. 2d 732, 738 (Fla. 2001) (citing *Banks v. State*, 732 So. 2d 1065, 1067 n.5 (Fla. 1999)). Competent, substantial evidence supports Zieler's convictions.

Zieler was not a suspect until 26 years after the murders, when his DNA sample was obtained in an unrelated case. That sample led to a CODIS hit, and upon further testing, Zieler's DNA profile was determined to be a one-in-83 quintillion match to the DNA samples obtained from R.C.'s bedsheet, a one-in-450 million match to the pillowcase that was located under R.C., a one-in-16 million match to hairs obtained from the body of L.S., and a one-in-360,000 match to the genital swabbing from R.C. A DNA analyst testified that the DNA obtained from the genital swabbing of R.C. could not have been transferred onto her. Zieler attempted to explain the presence of his DNA at the crime scene by stating that he had visited the condominium the year before, but R.C.'s mother rebutted this claim. Additionally, Zieler's claim that he was in jail in another state at the time of the murders was shown to be false.

## CONCLUSION

For these reasons, we affirm Zieler's convictions and sentences of death.

It is so ordered.

MUÑIZ, C.J., and COURIEL, GROSSHANS, FRANCIS, and SASSO, JJ., concur.
TANENBAUM, J., concurs with an opinion.
LABARGA, J., concurs in result with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

TANENBAUM, J., concurring.

There simply cannot be a cognizable, "unpreserved" claim on appeal from a judgment that a criminal defendant received ineffective assistance of trial counsel, even if that ineffectiveness purports to appear "on the face of the record." *See Steiger v. State*, 328 So. 3d 926, 928, 932 (Fla. 2021). As far back as writ-of-error days, this court has said that the purpose of direct review is to consider "the different *rulings made by a trial court*, whether upon the pleadings or during the trial of the action," it being "incumbent" on the appellant "to show that the *different rulings of the trial court*, or certain of them, are so infected with error as to call for and compel a reversal of the judgment." *McKinnon v. Lewis*, 53 So. 940,

- 34 -

942 (Fla. 1910) (emphases supplied).

An unpreserved claim regarding counsel's ineffectiveness necessarily is unrelated to any opportunity for a trial court ruling. Notably, there could be any number of tactical reasons, known only to trial counsel, for the purported action or inaction by counsel. It is unclear, then, where in a proceeding a trial court might intervene to head off or correct a decision made by trial counsel. It is a misnomer to call any ineffectiveness "error" in the absence of any clear opportunity for the trial court to have acted. This court's suggestion in *Steiger*—that there could possibly be consideration of an unpreserved claim of ineffectiveness of counsel in an appeal—makes no sense and should be revisited.

In this appeal, I agree with the majority's full analysis supporting affirmance, save for its reliance on *Steiger*. On that excepted point, I instead would reject the argument as non-cognizable on direct review.

LABARGA, J., concurring in result.

I fully agree that competent, substantial evidence supports Zieler's convictions for the first-degree murders of R.C. and L.S.

- 35 -

I concur in result, however, because I continue to adhere to the views expressed in my dissenting opinion in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020) (abandoning this Court's decades-long practice of conducting comparative proportionality review in cases involving the direct appeal of a sentence of death).

An Appeal from the Circuit Court in and for Lee County,
    Robert Joseph Branning, Judge
    Case No. 362016CF000455000ACH

Blair Allen, Public Defender, and Steven L. Bolotin, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida,

    for Appellant

James Uthmeier, Attorney General, Jeffrey Paul DeSousa, Acting Solicitor General, and Christina Pacheco, Senior Assistant Attorney General, Tallahassee, Florida,

    for Appellee